SLADE GORTON & CO., INC. *vs.* JOHN F. O'NEIL.

Suffolk. November 4, 1968. — December 3, 1968.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Contract*, Agreement not to compete. *Equity Jurisdiction*, Specific performance, Agreement not to compete.

In a suit in equity by a fish wholesaler and broker in Boston against a former assistant sales manager to enjoin him from violating a covenant in their employment contract that upon his leaving the employment of the plaintiff he would not engage in any business competitive with that of the plaintiff for a period of five years within certain areas, where it appeared that two years after making the contract the defendant resigned from the plaintiff's employ and worked as a salesman for a competing concern for a month until he was enjoined from doing so by a preliminary injunction issued in the suit, subsidiary findings by a master with respect to interference with the plaintiff's good will and damage to its interests, the nature and extent of the competitor's operations in the covenant areas, and information about

the plaintiff possessed by the defendant, apparently none of which was highly confidential or secret, warranted the trial judge in concluding that there was no occasion for enforcement of the covenant following dissolution of the injunction nearly a year after its effective date, and a final decree dismissing the bill was affirmed.

BILL IN EQUITY filed in the Superior Court on May 9, 1966.

The suit was heard by *Chmielinski,* J., on a master's report.

*James P. Lynch, Jr.,* for the plaintiff.

*Robert W. Harrington* for the defendant.

CUTTER, J.   The plaintiff (Slade) by its bill seeks to enjoin O'Neil, a former employee, from violating a covenant not to compete [1] contained in a written contract of employment of O'Neil as assistant sales manager.   A preliminary injunction against such violation was in effect from June 6, 1966, until May 23, 1967, when certain exceptions to a master's report were sustained and the master's report, as modified, was confirmed.   By final decree the bill was dismissed, but this decree was revoked on June 1, 1967.   A new final decree dismissing the bill was entered on January 4, 1968.   From this Slade appeals.   The facts are stated on the basis of the master's report as modified.

Slade has engaged in the fish business in Boston since 1929 as a primary wholesaler and fish broker.   O'Neil, a business school graduate specializing in marketing, in 1963 answered Slade's newspaper advertisement for an assistant sales manager.   At that time, he "was a highly skilled . . . person with varied and diversified experience as a salesman, market researcher, market analyst, and supervisor of personnel for" well known firms.   O'Neil was told by Slade, before he was hired on an "at will" basis for a weekly salary of $192.50 (over $10,000 a year), plus "bonuses or commissions in the

---

[1] The covenant provided that O'Neil "agrees that upon his leaving the employment of . . . [Slade], for whatever reason . . . he [O'Neil] shall not either directly or indirectly, either as owner, employee . . . or investor, engage in any business which is competitive with that of . . . [Slade], for a period of five (5) years . . . within . . . Massachusetts and also within an area encompassing any point within fifty (50) miles from the . . . seacoast of . . . Maine, New Hampshire, Rhode Island and Connecticut."

sole discretion of Slade," that "(a) he would break into the city sales department; (b) he would probably move into selling; (c) he might also assume supervisory or administrative work; [and] (d) he might handle some buying. He was [also] told . . . that Slade would lay out his duties for him; and that the latter could change his duties from time to time. O'Neil . . . agreed to this arrangement. In addition, Slade told O'Neil he would place him where he could be of the most value to the company and explained that his duties would be subject to change . . . according to how O'Neil proved himself."

In September, 1963, when O'Neil first worked for Slade, he had no written employment agreement. He was one of several employees with the title of assistant sales manager.[2] The others "did not [do] administrative work but concentrated on selling."

As O'Neil learned the business, Slade gave him more responsibility, a number of accounts to handle, and a territory to prospect. By the time he signed his written employment agreement (fn. 1) on May 23, 1964, O'Neil had "various executive and supervisory duties, including the supervision of all salesmen employed by . . . [Slade], holding . . . sales meetings . . . [and] some policy-making functions." From September, 1963, to April 30, 1964, he was paid several hundred dollars as commissions.

O'Neil, before signing the written employment agreement, read it "and understood fully its terms and import." He was given a copy. Other assistant sales managers signed similar documents. "Although O'Neil is described as 'assistant sales manager,' in the agreement, his duties are not defined." He "was aware he was to perform those duties . . . assigned to him by Slade."

O'Neil had access to data and information which the master found to be "significant in the operation of . . . [Slade's] business." He dealt with the entire Gorton line, covering some 350 items of fish. He mailed sales brochures,

---

[2] On occasion O'Neil used the title of sales manager, with Slade's knowledge, because the title was useful to Slade in soliciting customers.

had contact with customers, ascertained prospects, supervised salesmen, had access to the names and addresses of all customers and some suppliers, reviewed bills, and had credit, salary, and sales information (cost, selling prices, profit margins). The main source of prospective customers, however, was not confidential, but in fact was the "yellow pages" telephone directory. Because of the daily variation in fish prices, the sales information known to O'Neil before May, 1966, when he left Slade's employ, would not be valuable thereafter.

O'Neil, after starting out well, began to "lose steam." In the summer of 1965 Slade gradually changed O'Neil's duties. The handling of the price list was first removed, and then the direction of sales meetings, so that O'Neil could spend more of his time selling. Later, about half of O'Neil's accounts were taken away because, in Slade's judgment, O'Neil had failed to produce adequate sales volume. Slade's decisions were made in good faith, without changing O'Neil's bonus, salary, or commission arrangements.[3] It was not unusual for accounts to be taken from some employees and given to others.

Although O'Neil continued to do some work other than selling (e.g. buying salt fish), he became dissatisfied because of changes in his duties and the promotion of another to the position of sales manager (to exercise supervisory duties which O'Neil theretofore had performed). O'Neil did not express his feelings to Slade, but he felt that there was no future for him with the company. Accordingly, in 1966, he began negotiations with other wholesale fish dealers, including Fulham & Maloney, Inc. (Fulham). Although urged to stay with Slade, he resigned on May 3, 1966, and worked for Fulham (essentially as a salesman at a lower salary and without any bonus, commissions, or title) until enjoined from doing so on June 6, 1966.

Slade is engaged mainly in selling to other wholesalers.

---

[3] In the summer of 1965, O'Neil's salary was raised to $212 per week, and for 1965 O'Neil received more than $14,000, including salary, bonus, and commissions.

It, on occasion, sells to chain stores, as does Fulham, but the findings do not clearly show that the two companies sell the same products to chain stores. Slade encounters competition from other wholesalers both in buying and in selling. It has customers in thirty-five states, including Connecticut, Maine, Massachusetts, New Hampshire, and Rhode Island. To some of these customers O'Neil himself made sales. Fulham is also a primary wholesaler and buys from some sources of supply from which Slade also buys. Both companies "have occasionally sold products to the same customers." Such products do not represent a very substantial percentage of the business of one or the other company. Fulham's "line is fluid, capable of expansion, and varies from time to time." Slade at all material times has handled everything on the Fulham product line except one product representing one quarter of Fulham's business.

The following are the principal conclusions of the master. (1) O'Neil made the decision to leave Slade. (2) Fulham and Slade compete in purchasing items handled by both companies and in selling "in some areas and to some extent." (3) O'Neil took no customers' lists with him. (4) Price information possessed by O'Neil prior to May, 1966, has become obsolete. (5) O'Neil knew in May, 1966, that Fulham was competing with Slade in certain areas and that he would be in competition with Slade if he worked as a salesman for Fulham. The master concluded (so far as it might be a question of fact) that an injunction against O'Neil for five years (see fn. 1, *supra*) was not required to afford Slade reasonable protection and "that a period not in excess of two . . . years" would suffice.

1. The subsidiary findings indicate (a) that O'Neil was employed with the title of assistant sales manager to do either supervisory work or sales as assigned to him by Slade; (b) that his duties were changed from time to time by Slade in good faith in the light of O'Neil's performance and demonstrated abilities; and (c) that O'Neil left Slade of his own volition, although urged to remain without loss of salary and with reasonable prospects for future employment. We

assume, without deciding, that the employment agreement was not inherently unfair, was enforceable, and was made for valid consideration (see *Economy Grocery Stores Corp.* v. *McMenamy*, 290 Mass. 549, 552; *Cygan* v. *Megathlin*, 326 Mass. 732, 734–736); that there was no breach by Slade of the employment agreement, reasonably interpreted, which would make equitable relief inappropriate (cf. *Rayner* v. *McCabe*, 319 Mass. 311, 314; *National Overall Dry Cleaning Co.* v. *Yavner*, 321 Mass. 434, 440); and that it was not abandoned or superseded by the conduct of the parties prior to O'Neil's resignation. Cf. *F. A. Bartlett Tree Expert Co.* v. *Barrington*, 353 Mass. 585, 587–588.

2. The question for decision is whether the master's findings require specific enforcement of O'Neil's covenant not to compete. Various considerations lead us to the conclusion that specific enforcement is not required, at least beyond the period June 6, 1966, to May 23, 1967. As already noted, during that period O'Neil was subject to a preliminary injunction preventing him from working for Fulham.

The master's subsidiary findings do not establish a basis for concluding that Slade possessed good will of a type which would be adversely affected if O'Neil were to work for a competitor. A subsidiary finding that good will existed was struck from the report on O'Neil's objection that it was unsupported by evidence. The evidence summarized by the master, as supporting the finding, showed only that Slade was organized in 1929, had a branch office in Chicago, and had as customers, among others, three well known chain food stores. We assume that Slade possessed some good will, but the master's subsidiary findings do not establish to what extent any good will existed in the territory (the covenant area) in which O'Neil's covenant not to compete applied. See *Club Aluminum Co.* v. *Young*, 263 Mass. 223, 225–228. Cf. *New England Tree Expert Co. Inc.* v. *Russell*, 306 Mass. 504, 509–511.

The subsidiary findings concerning the nature and extent of Slade's and Fulham's operations in the covenant area

(although Slade supplies many customers there) are also meager. It does not appear adequately in what manner (a) there was either direct or indirect competition between the two companies in that area, or (b) O'Neil's employment by Fulham would have any substantial effect upon Slade's interests, or cause Slade any significant damage, after May 23, 1967, when the preliminary injunction was dissolved. The findings also do not establish how information possessed by O'Neil as a consequence of his working for Slade could be used by O'Neil for Fulham adversely to Slade's interests. None of the information about Slade possessed by O'Neil appears to have been highly confidential or secret. Cf. *Novelty Bias Binding Co.* v. *Shevrin,* 342 Mass. 714, 716–718; *New England Overall Co. Inc.* v. *Woltmann,* 343 Mass. 69, 75–78. Cf. also, *Abramson* v. *Blackman,* 340 Mass. 714, 715–716.

The trial judge reasonably concluded, in effect, that there was no occasion for further enforcement of the covenant.

*Decree affirmed.*