ROBERT H. KROEGER *vs.* THE STOP & SHOP COMPANIES, INC.

Suffolk. November 10, 1981. — March 16, 1982.

Present: GOODMAN, PERRETTA, & KASS, JJ.

*Contract*, Employment, Forfeiture of deferred compensation, Covenant against competition. *Damages*, Employment contract.

In an action by a corporate vice president to recover from his former employer retirement benefits under a deferred compensation agreement containing a forfeiture for competition clause, a judge's findings supported his conclusion that the employer had a legitimate business interest in restraining the plaintiff from disclosing confidential data to its competitors. [316-317] GOODMAN, J., dissenting on the ground that there is nothing in the findings to indicate that "confidential data" were involved.

In an action by a corporate executive to recover from his former employer retirement benefits under a deferred compensation agreement containing a forfeiture for competition clause, the judge properly concluded that, in the circumstances, a geographical restriction upon the competitive activity of the executive anywhere east of the Mississippi River, except for five designated Southern States, was overbroad and only enforceable as to the New England States, New Jersey, and New York where the former employer had operated stores. [317-318]

In an action by a corporate executive to recover from his former employer retirement benefits under a deferred compensation agreement containing a forfeiture for competition clause, the judge properly reduced to a period of one year a time restriction upon the competitive activity of the executive "so long as he lives" as reaching well beyond the employer's legitimate interests. [318]

Where a corporate vice president, discharged after ten years of employment in circumstances involving no misconduct on his part, violated a valid deferred compensation agreement containing a forfeiture for competition clause, a loss of $29,235 as estimated monetary damages flowing from the employee's breach of the noncompetition clause was held not unreasonable by this court, based on the trial judge's findings that the agreement envisioned seventeen years of service prior to retirement, that the cost of purchasing the annuity benefits the employee would have received was $71,000, and that the employee had earned ten seventeenths of his retirement benefits ($41,765) for his ten years of service. [318-322] GOODMAN, J., dissenting.

In an action to recover unpaid retirement benefits earned under a deferred compensation agreement, the record supported the judge's conclusion that the cost of an individual annuity was an appropriate manner in which to compute any damages owed. [322-323]

In an action to recover unpaid retirement benefits earned under a deferred compensation agreement, the judge did not abuse his discretion in allowing a life insurance salesman to testify as an expert concerning the cost of an individual annuity where the salesman demonstrated sufficient understanding of the methods by which the cost of the annuity was calculated. [323]

In an action by an executive to recover from his former employer unpaid retirement benefits earned under a deferred compensation agreement, the judge erred in his conclusion that the discharged executive suffered no damage and was entitled to no recovery because he had negotiated a retirement allowance with his new employer to be reduced by an amount equal to any benefits he received under his agreement with his former employer. [323]

CIVIL ACTION commenced in the Superior Court on October 14, 1977.

The case was heard by *Ronan, J.*

*Lawrence H. Adler* for the plaintiff.

*Paul F. Ware, Jr. (Joan I. Milstein & Andrew S. Hogeland* with him) for the defendant.

KASS, J. For a decade the plaintiff, Robert H. Kroeger (Kroeger), scaled the corporate ladder at The Stop & Shop Companies, Inc. (Stop & Shop). His annual bonuses, added to his salary, were such as to stimulate Kroeger in 1961 to ask for a deferred compensation arrangement. In response Stop & Shop proffered a written agreement which, in the argot of the trade, applied "golden handcuffs." That is, should Kroeger "so long as he lives," go to work for a competing business east of the Mississippi, he would lose all.[1] It

[1] More specifically, the deferred compensation agreement provided that following termination of the Period of Active Employment (a defined term), Kroeger, for so long as he lived, was not to have an interest in excess of $100,000 in a competing business and would not serve a competing business as an officer, director, partner, trustee, proprietor, or employee. "Competing business" was defined as a business located east of the Mississippi except for Florida, Georgia, Alabama, Mississippi and Louisiana

is the reasonableness of the forfeiture provision that is the problem for decision.

In *Cheney* v. *Automatic Sprinkler Corp. of America*, 377 Mass. 141 (1979), the court reconsidered whether forfeiture for competition clauses in deferred compensation agreements should receive unconditional enforcement. That had been the accepted view as manifested by *Flynn* v. *Murphy*, 350 Mass. 352, 353 (1966), in which a forfeiture provision was enforced without discussion. See also *Chase* v. *New York Life Ins. Co.*, 188 Mass. 271, 273-274 (1905); *Union Central Life Ins. Co.* v. *Coolidge*, 357 Mass. 457, 459 (1970).[2] *Cheney* held that the enforcement of forfeiture for competition provisions should be subject to the same tests of reasonableness as apply to the enforcement of covenants not to engage in competition with a former employer, whether independently or by working for a competitor. *Cheney* v. *Automatic Sprinkler Corp. of America*, 377 Mass. at 147-149. Rather than declining entirely to give effect to an unreasonable noncompetition clause, a court may modify its terms so as to make it reasonable; i.e., onerous terms may be cut back. *Id.* at 147.

Reluctance to give full effect to post-employment restraints has a long history in the law. For example, in 1587, a blacksmith was jailed by local justices of the peace when he had the temerity to bring an action on another blacksmith's (thought to have been an apprentice) bond not to

and which was substantially similar to Stop & Shop business at the end of the period of Active Employment. In 1969 the definition of competing business was made broader to account for the fact that Stop & Shop had in the interim gone into the discount department store business under the name Bradlees and into what was described as a "drugstore operation." The enlarged definition (which also brought into the web any State contiguous to a State into which Stop & Shop entered) was contained in a letter agreement dated May 27, 1969. That letter expressed the intent that Kroeger was not to be involved in "any business which competes with any activity in which Stop & Shop or any subsidiary may be engaging."

[2] The *Cheney* opinion may be viewed as consistent with the diminished potency of classic ideas of contract, a subject discussed in Gilmore, The Death of Contract (1974). Compare Fried, Contract as Promise (1981).

ply his trade in the town of South-Mims. Blake, Employee Agreements Not to Compete, 73 Harv.L.Rev. 625, 635 (1960).[3] The Blake article recounts the evolution of the attitudes taken by English and American courts toward post-employment restraints. Among the questions which courts typically ask are: Is the restraint greater than necessary to protect legitimate interests of the employer? What circumstances surrounded its making, in terms of the bargaining power of the parties? Is the restraint unduly harsh or oppressive? Is the restraint injurious to the public? Does the employee's work for a rival in fact injure the former employer? See *All Stainless, Inc.* v. *Colby*, 364 Mass. 773, 778 (1974); *National Hearing Aid Centers, Inc.* v. *Avers*, 2 Mass. App. Ct. 285, 288-292 (1974); Restatement (Second) of Contracts § 188 (1981); 14 Williston, Contracts § 1643A, at 157 (3d ed. 1972); 6A Corbin, Contracts § 1394 (1962).

As to a provision requiring forfeiture of financial benefits, we look first to whether the new employment would be subject to a covenant not to compete. If not, the forfeiture is likewise unenforceable. Should the covenant not to compete, however, be enforceable, the amount and nature of the forfeiture come into play and are subject to modification. *Cheney* v. *Automatic Sprinkler Corp. of America*, 377 Mass. at 148.

It is time to turn to the facts found by the trial judge. These we accept unless clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 674 (1977). *C.C. & T. Constr. Co.* v. *Coleman Bros.*, 8 Mass. App. Ct. 133, 135 (1979). We have added facts which are apparent in the record before us and are not disputed. Kroeger joined Stop & Shop in 1952 as controller and, as we have indicated, he was doing sufficiently well as to annual income in 1961 so that he asked for deferred compensation. Stop & Shop concurred

---

[3] The unfortunate suitor was released by the Court of Common Pleas, but that court decided that the bond was "void, because it was against the law." Blake, Employee Agreements Not to Compete, 73 Harv.L.Rev. at 635.

with the idea of a deferred compensation plan and an agreement was carefully drawn by Stop & Shop's counsel. It was tailor-made to the situation of Kroeger and several other high executives. Kroeger did not retain counsel. Payments to be made to Kroeger under the agreement when he retired (or otherwise became eligible for payment) were not in lieu of dollars which might have been paid to Kroeger directly; i.e., there was no diminution of bonus or other compensation attributable to company payments to the deferred compensation plan nor were other fringe benefits curtailed.

By 1971, Kroeger was vice president of the "Food Division," Stop & Shop's largest component, with responsibility for its profits and losses. As the judge put it, "Kroeger was concerned with all overall company financing, planning, expansion concepts and competition concerns. Kroeger was therefore privy to the operations of the other divisions [of Stop & Shop] . . . . He participated in all real estate acquisitions and the financial arrangements regarding the same." That same year, however, there was a falling out between Kroeger and Stop & Shop. A new president had taken the reins. He was younger than Kroeger and had once reported to him. Their personalities were dissimilar, as were their marketing philosophies. Kroeger was asked to go. The golden handcuffs were unlocked; the departing handshake was leaden. Indeed, Stop & Shop by letter sought "confirmation of our understanding that you do not plan to compete . . . within the meaning of your employment agreement; that if you should . . . all benefits . . . will be waived and forfeited." Asked to "indicate" on a copy "that the above summary accurately reflects the benefits . . . and competition agreement," Kroeger did so by signing a copy of the letter.

Kroeger within six months found employment as vice president-retail foods, of Pneumo Dynamics Corporation (Pneumo), an Ohio company which owned a subsidiary, P & C Supermarkets, Inc. (P & C). In that capacity, he had responsibility for some 300 stores in the P & C net-

work,[4] which did business in New York, New Hampshire, Vermont and Massachusetts. Stop & Shop operated stores in the New England States, New York and New Jersey, but the only specific location in which Pneumo and Stop & Shop competed head to head was Manchester, New Hampshire. The confrontation in Manchester did not occur until 1975, about four years after Kroeger's departure from Stop & Shop.

Had Kroeger remained with Stop & Shop until his retirement, as the deferred compensation agreement contemplated, the provision which restrained him from competing would have been quite reasonable. The agreement provided for the payment of an annuity on a formula basis[5] and that during retirement Kroeger "shall be available for advice and counsel . . . at all reasonable times by telephone, letter or in person." If Kroeger were to be in retirement, be paid his retirement allowance and be available to Stop & Shop for consultation, it was not too much to ask that he not compete with Stop & Shop. Restatement (Second) of Agency § 394 (1958). His discharge at age fifty-eight changed that; he would not get retirement benefits for seven years and it was evident from the circumstances of his severance that Stop & Shop would have no interest in his advice. In the meantime he had to make a living, and it was unlikely that he could do so other than in the business in which he had spent his working life.

After making his subsidiary findings the judge concluded that, although Stop & Shop had a legitimate protectible interest, the restrictive provision was overbroad and required cutting back. As to time, the judge determined that a prohibition from competition of one year was reasonable. As to geographical limitations, the restraint was to be given effect only in the New England States, New Jersey and New

---

[4] These 300 stores included: company owned supermarkets; Big "M" stores, which were run on a franchise basis; and independent stores.

[5] If he retired at age 65, Kroeger would receive $9,240 per year; if he retired earlier, the annual payment would be less. If he should die before age 65 or during the payout period, death benefits would be paid to designated beneficiaries.

York. Since Kroeger had, within one year, gone to work for a competitor active in the proscribed area (the judge also found that "these competitors were colliding along their expanding perimeters"), he had forfeited his retirement benefits. In any event, the judge concluded, since Kroeger had negotiated compensatory retirement benefits with Pneumo and, indeed, had agreed to pay Pneumo whatever he recovered from Stop & Shop (provided that Pneumo paid the legal expenses), Kroeger had suffered no loss and was entitled to no recovery. Judgment entered for Stop & Shop and from that judgment Kroeger has appealed.

1. *Is the restraint greater than necessary to protect legitimate interests of the employer?* Those interests of an employer which are entitled to protection are trade secrets, confidential data and good will. *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. at 674. *Wells* v. *Wells*, 9 Mass. App. Ct. 321, 323 (1980). Stop & Shop has conceded that no trade secrets are involved. Good will generally applies to customer relationships. *Angier* v. *Webber*, 14 Allen 211, 215 (1867) (good will described as benefit derived from reputation for promptness, fidelity and integrity with customers). Thus, salesmen or sales managers have the capacity to injure the good will of their former employers. See e.g., *New England Tree Expert Co.* v. *Russell*, 306 Mass. 504 (1940); *All Stainless, Inc.* v. *Colby*, 364 Mass. at 777; Restatement (Second) of Contracts § 188, Comment g, Illustration 7 (1981). See generally Blake, Employment Agreements Not to Compete, 73 Harv.L.Rev. 625, 653-667 (1960). Given the nature of Kroeger's duties — financial planning, site acquisitions, merchandising strategy, advertising — it is highly improbable that he meant a thing to Stop & Shop's customers. To the degree that Stop & Shop had something to restrain, it would have been the disclosure of confidential data to a competitor.

Sources of supply and product lines are in the area of generally available information in the supermarket business. Not widely known, the judge found, are the expansion plans and merchandising strategy of a particular chain and that

chain's market success in specific locations. It would seem that whether a competitor of Stop & Shop might enter an area in which it was doing business might, in turn, depend on Stop & Shop's plans to improve its store in that area, to add another store, or to alter the style of merchandising (e.g., adding amenities and increasing product variety or emphasis on fast moving items at lower prices). Similarly an executive at Kroeger's level might have information about a product mix or retail device (trade stamps, coupons, or warehouse style store) which did or did not enjoy success in a given location. The judge's findings concerning Kroeger's knowledge about Stop & Shop's "potential new locations . . . [r]ecent past profitability and present investment strength . . . advertising techniques and marketing devices" supported his conclusion that Stop & Shop had a legitimate business interest in restraining Kroeger, albeit, as we shall see, an interest with a limited shelf life. Cf. *Novelty Bias Binding Co.* v. *Shevrin,* 342 Mass. 714, 716-718 (1961); *New England Overall Co.* v. *Woltmann,* 343 Mass. 69, 75-78 (1961).

Restraints upon the competitive activity of a key executive may range beyond the precise geographical area of activity at the time of the employee's departure. See Blake, Employee Agreements Not to Compete, 73 Harv.L.Rev. at 679. A business enterprise may, after all, have new worlds to conquer. See *Wells* v. *Wells,* 9 Mass. App. Ct. 321, 326 (1980), which was, however, decided in a different business context. Compare *New England Tree Expert Co.* v. *Russell,* 306 Mass. at 510. Contrast *All Stainless, Inc.* v. *Colby,* 364 Mass. at 779-780; *Marine Contractors Co.* v. *Hurley,* 365 Mass. 280, 289 (1974); *Middlesex Neurological Associates* v. *Cohen,* 3 Mass. App. Ct. 126, 130 (1975). However, Stop & Shop had never operated stores other than in New England, New Jersey and New York and nothing in so much of the record as was reproduced on appeal suggests plans for westerly and southerly expansion. We agree with the judge's conclusion that the clause in the employment agreement which attempted to keep Kroeger away from a

business like Stop & Shop's anywhere east of the Mississippi
River (except for Florida, Georgia, Alabama, Mississippi and
Louisiana) was overbroad. The judge's cutting back of the
area of restraint to the New England States, New Jersey and
New York was reasonable.

Similarly the clause isolating Kroeger from a competitor
for "so long as he lives" reached well beyond Stop & Shop's
legitimate interests. Consumer trends and the marketing
strategies which retailers devise to exploit them are of limited
duration, as the judge found, and the confidential informa-
tion which Kroeger possessed would soon go stale. There
was nothing unreasonable in the judge's cutting the period
of restriction to one year. See Blake, Employee Agreements
Not to Compete, 73 Harv.L.Rev. at 680; Mertz, Recent De-
velopments Concerning Employee Covenants Not to Com-
pete: A Quiet "Corbinization" of Massachusetts Law, 12
New England L. Rev. 647, 688 (1977).

2. *Is the restraint unduly harsh or oppressive?* Common-
ly it is a fault of postemployment restraints that they have
aspects of a contract of adhesion: the employee, anxious for
the job, is ready to mortgage the future and, in any event, is
in a poor position to argue about the terms of the employ-
ment contract. *Cheney* v. *Automatic Sprinkler Corp. of
America*, 377 Mass. at 147. But the restrictive clause may
be more reasonable in the case of a key employee, *id*. at 148,
and this is such a case. Kroeger was well ensconced in the
executive structure of Stop & Shop and, indeed, took the in-
itiative in asking for deferred compensation. It could hard-
ly be said that he was powerless to negotiate the terms of the
agreement he entered into in 1961, the amendment to that
agreement in 1969, and the written acknowledgment of the
restrictions in the agreement when Kroeger departed from
Stop & Shop in 1971. There is a temptation to hold Kroeger
to the bargain which he so obviously understood. "If I
make a promise to you, I should do as I promise; and if I fail
to keep my promise, it is fair that I should be made to hand
over the equivalent of the promised performance." Fried,

Contract As Promise 17 (1981).[6]  But "[o]ut of concern for an individual's ability to earn a living and to protect against monopoly," *Wells* v. *Wells*, 9 Mass. App. Ct. 321, 333 (1980), courts now require that promises not to work or do business be reasonable. *All Stainless, Inc.* v. *Colby*, 364 Mass. at 778; *Marine Contractors Co.* v. *Hurley*, 365 Mass. at 288; *National Hearing Aid Centers, Inc.* v. *Avers*, 2 Mass. App. Ct. at 288-292. A key executive's bargaining status does not, therefore, remove the reasonableness of his promise from consideration; it does, however, enlarge judicial tolerance of restraints by an employer which might be seen as unreasonable between parties of unequal bargaining strength. Cf. *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 308 (1982), which noted, in connection with the legitimacy of intrusion into the private affairs of employees, that whether public policy was violated could depend on the rank and station of the employee. We have already approved the modified restraints determined to be reasonable by the trial judge. Those restraints Kroeger violated. It remains for us to consider whether a total forfeiture of his deferred compensation benefits was a reasonable price for him to pay. *Cheney* v. *Automatic Sprinkler Corp. of America*, 377 Mass. at 148.

Possible forfeitures of deferred compensation present a different problem from the usual postemployment restraint cases in that the question is not whether the employee may follow the occupation he knows, but what price in dollars he shall pay for so doing. And shall the employee be made to forfeit money which he has in fact earned? In this regard it is of consequence that Kroeger did not leave Stop & Shop voluntarily.[7]

---

[6] Several decades ago that view was the unquestioned working assumption. See *Becker College of Business Admn. & Secretarial Science* v. *Gross*, 281 Mass. 355, 356 (1933), which began: "The defendant, a man of full age, married and a father, contends that he is not bound by his agreement under seal . . . ."

[7] "[P]rocedural niceties aside," the judge found, "the termination was at the election of Stop & Shop."

Termination of the employment relationship at the initiative of the employer does not itself render a noncompetition provision invalid. This is so in the case of a discharge for obvious cause, as in *Novelty Bias Binding Co.* v. *Shevrin*, 342 Mass. at 717, where the employee stole from the company, and sometimes when cause is not an issue, see e.g., *Wrentham Co.* v. *Cann*, 345 Mass. 737, 740 (1963).[8] But if the discharge is inequitable, an otherwise reasonable restraint may not be enforced. *Economy Grocery Stores Corp.* v. *McMenamy*, 290 Mass. 549, 551-553 (1935). Blake, Employee Agreement Not to Compete, 73 Harv.L.Rev. at 685. Cf. *Slade Gorton & Co.* v. *O'Neil*, 355 Mass. 4, 9 (1968). While there is no suggestion that Stop & Shop acted in bad faith or with an ulterior motive when it asked Kroeger to go, compare *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 103-105 (1977), it is apparent that the parties' expectations had been substantially altered from those which underlay the agreement. Golden handcuff agreements, as the label implies, are designed to encourage an employee to stay by making it painful to leave. Stop & Shop expressly abandoned the purpose of holding on to Kroeger and it seems inequitable that it should exact the full penalty devised to make the glue between the company and its employee stick. Particularly in the case of retirement benefits which an employee has earned,[9] courts should avoid

---

[8] The *Wrentham Co.* case involved an agreement to sever the relationship because "[d]ifferences between Cann [the employee] and the management developed." That is a rational and fair reason to end a private employment relationship (assuming nothing to the contrary in an employment agreement or a governing collective bargaining agreement) even though the employee has performed faithfully and is not "at fault." Similarly, in the instant case, the personality and policy differences between Kroeger and Stop & Shop take his discharge out of the category of an arbitrary one.

[9] Although it does not appear that Kroeger's base compensation was reduced by any specific amount to adjust for the deferred compensation, the latter was a component in his entire compensation package and in that sense the retirement benefits were more than a gratuity. Cf. *Rochester Corp.* v. *Rochester*, 450 F.2d 118, 120-121 (4th Cir. 1971). From section II of the agreement between Kroeger and Stop & Shop it may be inferred

forfeiture of those rights where possible. *Hoefel* v. *Atlas Tack Corp.*, 581 F.2d 1, 6 (1st Cir. 1978), cert. denied, 440 U.S. 913 (1979). See also the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. (1976). We are of opinion that, when an employee is discharged in circumstances involving no misconduct by the employee (see note 8, *supra*), the employee's deferred compensation benefits should not be forfeited to the extent those benefits have been earned, even though the employee violates a valid postemployment restriction. Cf. *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 671-672 (1981).

In the case at bar, the employment agreement contemplated retirement at age sixty-five, unless retirement occurred earlier because of total and permanent disability. Kroeger was forty-eight in 1961 when the agreement was entered into, thus the agreement envisioned seventeen years of service by him. He had worked ten years when Stop & Shop terminated his employment. Kroeger had, therefore, earned ten seventeenths of his retirement benefits.[10] The judge found that the cost of purchasing the annuity benefits Kroeger would have received was $71,000. Accordingly, Kroeger is entitled to recover ten seventeenths of that amount viz., $41,765.

He, thus, loses $29,235 without Stop & Shop having established specific pecuniary damages by reason of Kroeger's activity as an employee of Pneumo. It is, however, not necessary to establish the precise monetary damages which flow from the breach of a covenant not to compete; a promise to pay a specific amount as damages, i.e., liquidated damages, will be given effect. Restatement (Second) of Contracts § 356, Comment b, Illustration 2 (1981). Cf. *National Hearing Aid Centers, Inc.* v. *Avers*, 2 Mass. App. Ct.

that Kroeger also participated in a contributory retirement income plan as to which, it appears, receipt of benefits was not conditioned on post-employment conduct.

[10] Indeed the written agreement between Kroeger and Stop & Shop contemplated "A retirement allowance for Employee, with vested rights thereto."

at 288 n.2.  This is because the task of quantifying the consequences of violating a noncompetition clause is a particularly difficult and elusive one.  *Edgecomb* v. *Edmonston*, 257 Mass. 12, 19 (1926).  *Lufkin's Real Estate, Inc.* v. *Aseph*, 349 Mass. 343, 346 (1965).  Compare *Wilson* v. *Clarke*, 470 F.2d 1218, 1223 (1st Cir. 1972).  Hughes, Employee Non-Competition Agreements: A Review of Massachusetts Law, 63 Mass.L.Rev. 27, 31 (1978).  The very difficulty of establishing the damages inclines us to accept the estimate of damages made by the parties, if not otherwise unreasonable.  Restatement (Second) of Contracts § 356 (1981).  The loss of $29,235 by Kroeger does not seem unreasonable.  Contrast *Food Fair Stores, Inc.* v. *Greeley*, 264 Md. 105, 116-119 (1972).

3. *The determination of the cost of the annuity.*  The trial judge in his memorandum of findings and rulings wrote, "If however this court has erred and the plaintiff is entitled to damages measured upon a theory of cost of annuity basis, the damages sustained would be in the amount of seventy-one thousand dollars ($71,000)."  We read this as an expression that the court had determined that a cost of annuity basis was an appropriate manner in which to compute damages if any damages were owing at all.  From so much of the record as was included in the appendix it does not appear that alternative theories of damages were brought to the judge's attention.[11]  The cost of an individual annuity is a reasonable measure of damages in a case seeking recovery for unpaid retirement benefits.  See *Hoefel* v. *Atlas Tack Corp.*, 581 F.2d at 7.  To be sure, *Hoefel* dealt with unsophisticated investors and Kroeger was, presumably, a sophisticated one.  He well may have been able to secure a better rate of return than that which is factored into a life insurance company annuity contract.  But there was suffi-

---

[11] Both parties have repeatedly referred in their briefs to exhibits and portions of transcript which were not included in the appendix.  We need not look at parts of a record which have not been reproduced in an appendix.  *Kunen* v. *First Agricultural Natl. Bank*, 6 Mass. App. Ct. 684, 689 (1978).

cient support for the judge's conclusion (in a portion of the record which was reproduced in the appendix) so that we do not disturb it.

Stop & Shop also attacks the qualifications of the expert who testified on Kroeger's behalf concerning the cost of the annuity. The expert was a life insurance salesman. He demonstrated sufficient understanding of the methods by which the cost of an annuity is calculated so that we cannot say that the judge abused the broad discretion which was his "to determine whether an expert witness has a proper basis, in terms of adequate information and preparation, to render an opinion on the matter in dispute." *Louise Caroline Nursing Home, Inc.* v. *Dix Constr. Corp.*, 362 Mass. 306, 309 (1972).

4. *The consequence of the retirement benefits Kroeger received from Pneumo.* Mindful that his deferred compensation from Stop & Shop would very likely be contested, Kroeger negotiated a retirement allowance with his new employer, Pneumo, of $15,000 per year for his life and for the life of his wife, should she survive him. Those benefits were to be reduced by an amount equal to any benefits he received under his deferred compensation agreement from Stop & Shop. The trial judge concluded that, in consequence, Kroeger had suffered no damage and that "the first employer should not be forced to pay for the real benefit of the second employer." In this respect the judge was in error. Kroeger in effect made an assignment of whatever he might recover from Stop & Shop in return for the benefits Pneumo agreed to grant to him. We know no reason why he could not do so and none has been called to attention.

The judgment is reversed and a new judgment shall be entered in accordance with this opinion.

*So ordered.*

GOODMAN, J. (dissenting). I cannot agree that Kroeger must forfeit over $29,000 because he worked for no more

than six months[1] for an Ohio company (Pneumo) operating a chain of retail food stores.[2] There is nothing in the record which indicates that during those five or six months in 1971 Kroeger used any "confidential data" (*New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 674 [1977]) or indeed any information which in any way frustrated any of Stop & Shop's plans for expansion, novel marketing arrangements or was otherwise inimical to Stop & Shop. There is not the slightest indication of any damage to Stop & Shop or any competition with Stop & Shop prior to 1975 when both companies had stores in Manchester, New Hampshire, long after the contract as cut down by the trial judge had expired (see n. 1). Indeed, there is nothing in the record to indicate just what Kroeger did during those five or six months.

1. This record does not show that Kroeger, during these last five or six months in 1971, was "working in circumstances in which a covenant not to compete would be enforceable . . . [and in these circumstances] the burden of justification . . . becomes particularly onerous on the former employer. In such a case, the former employee's loss may assume the character of a forfeiture in the classical sense." *Cheney* v. *Automatic Sprinkler Corp. of America*, 377 Mass. 141, 148 (1979). It is significant that the plaintiff in *Cheney* (at 149) is given an opportunity to show "that the forfeiture is an unenforceable penalty clause . . . supported by a reference to facts which warrant the legal consequences asserted."

*Cheney* (at 146), cites *Food Fair Stores, Inc.* v. *Greeley*, 264 Md. 105, 116-119 (1972), for the proposition that "for-

---

[1] The noncompetition agreement was cut to one year from "so long as [Kroeger] lives." The court found that "about six months later the plaintiff secured employment with Pneumo . . . . As of June 1, 1971, the plaintiff became Vice President-Retail Foods [for Pneumo]." The letter dated August 16, 1971, at the end of the appellant's brief, indicates that the employment may not have started before July 23, 1971.

[2] In just what States the Ohio company was operating in 1971 is not clear. The court found in 1980 that "the outlets *are* in New York, New Hampshire, Vermont and Massachusetts." (Emphasis supplied.)

feiture of rights under [a] pension plan [is] an invalid restraint where [a] former employee's work for an indirect competitor created little, if any, hardship to his former employer." In our case there is not even evidence of indirect competition during the last six months or so of 1971. See *Bennett* v. *Les Schwab Tire Centers of Or., Inc.*, 48 Or. App. 909 (1980), following *Lavey* v. *Edwards*, 264 Or. 331, 336-337 (1973), also cited in the *Cheney* case at 146. In the *Bennett* case the court refused to permit a forfeiture of proceeds of various bonus provisions, characterized in the contract as "liquidated damages," which was tied to a noncompetition agreement the employee had violated. The court held (at 915) that "the amount thus available as compensation for the breach does not bear any relationship to the amount of damages from a breach," and that "the stipulation does not liquidate damages but imposes a penalty." Thus, too, in *Wilson* v. *Clarke*, 470 F.2d 1218 (1st Cir. 1972), in which a former employee was required to pay the former employer 15% of his income if he entered into the employ of a competitor, the court held (at 1223) that "the employer may not require its ex-employee to make payments to it unrelated to the employer's damage, simply as a penalty to discourage or punish a job change." Cf. *Economy Grocery Stores Corp.* v. *McMenamy*, 290 Mass. 549, 552 (1935). Of more significance for our case is n.4 of the *Wilson* case at 1224, which is set out in the margin.[3]

These cases, consistent with *Cheney*, hold that the reasonableness required is some reasonable relationship between the forfeiture provision and the damages sustained. Here there is none.

2. I find nothing in the findings to indicate that "confidential data" are involved. The general findings describe no more than the duties of a high level executive in the chain

---

[3] "To the extent Clarke's less than 1% of professional psychological services (i.e. for feedbacks and assessments) fit the literal language of the contract, we decline to enforce the 15% clause because of the obvious lack of correspondence between any proven damage to Nordli and the liquidated sum." *Wilson* v. *Clarke*, 470 F.2d at 1224 n.4.

supermarket business. There is nothing to indicate any spe-
cific confidential data which Kroeger took with him and
used. Blake, Employee Agreements Not to Compete, 73
Harv. L. Rev. 625, 673 (1960);[4] Note, Trade Secret Protec-
tion of Non-Technical Competitive Information, 54 Iowa
L. Rev. 1164, 1178-1179 (1969). It was Stop & Shop's bur-
den to isolate any such specific data from the skill and
knowledge gained from (as the trial judge found) "the busi-
ness activity that had constituted his life's work and expertise."
*Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9
Mass. App. Ct. 254, 268 (1980); see also 274; Note, Trade
Secret Protection of Non-Technical Competitive Informa-
tion, 54 Iowa L. Rev. at 1179. Thus, there was no showing
that Kroeger took from Stop & Shop anything which gave it
a demonstrable competitive advantage. See Restatement of
Torts § 757, Comment b (1939). Further, Kroeger did not
start at the bottom of the "corporate ladder." He joined
Stop & Shop at the age of thirty-eight or thirty-nine as con-
troller, and we do not know just what experience he brought
with him. See Blake, Employee Agreements Not to Com-
pete, 73 Harv. L. Rev. at 684-685, quoted in *Dynamics Re-
search Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct.
at 268; Note, Trade Secret Protection of Non-Technical
Competitive Information, 54 Iowa L. Rev. at 1179. More-
over, there is no hint of misconduct by Kroeger (he was, as
put by the trial judge, "forced" out). And there is nothing to
indicate that Stop & Shop "demonstrate[d] that [it] pursued
an active course of conduct designed to inform [its] employ-
ees that such secrets and information were to remain confi-
dential."[5] *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass.

---

[4] "Although particular business data of a company are in one sense
unique to the company and are typically not widely publicized, it is sub-
mitted that information representing the normal accretion of day-to-day
routines, as contrasted with the valuable product of special creative en-
deavors, should seldom, of itself, be sufficient to support an employee re-
straint." Blake, Employee Agreements Not to Compete, 73 Harv. L. Rev.
at 673.

[5] We note that no distinction is here made between confidential informa-
tion and trade secrets. See *Chomerics, Inc.* v. *Ehrreich*, 12 Mass. App. Ct.
1, 10 n.17 (1981).

835, 841 (1972). *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 276. It is true, of course, that no business concern wants to publicize its affairs, but this is not enough to bind Kroeger. *Chomerics, Inc.* v. *Ehrreich,* 12 Mass. App. Ct. at 8 n.13; *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 279, both citing *New Method Die & Cut-Out Co.* v. *Milton Bradley Co.*, 289 Mass. 277, 281 (1935), and other cases. Nor is the contract itself, without more, indicative of a confidential relationship. *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 277, citing and quoting from *Wheelabrator Corp.* v. *Fogle,* 317 F. Supp. 633, 637 (W.D. La. 1970), affd., 438 F.2d 1226 (5th Cir. 1971). See *Motorola, Inc.* v. *Fairchild Camera & Instrument Corp.*, 366 F. Supp. 1173, 1185-1186 (D. Ariz. 1973). Though Stop & Shop may look for "new worlds to conquer," it cannot for that reason exclude Kroeger from those worlds.[6] Absent misconduct or the exploitation of specific confidential information, he may go to a competitor in such new worlds. See *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 274.

*Reed, Roberts Associates* v. *Strauman,* 40 N.Y.2d 303, 309 (1976) (although not using the phraseology of our cases) is an apt summary of our case. "Apparently, the employer

---

[6] In *Chomerics, Inc.* v. *Ehrreich,* 9 Mass. App. Ct. at 9 n.16, we said:

"In a case such as ours, information which is so 'closely tied to the intrinsic knowledge of the inventor . . . [that it is not] possible to sort the process from the inner workings of a man's knowledge' is not protectible. *Amoco Prod. Co.* v. *Lindley,* 609 P.2d [733, 745 (Okla. 1980)]. We do not require an employee 'upon terminating his employment [to] search his mind for all thoughts relating to the business of his employer and set these down for the employer's reference . . . [so that] thereafter, he is forever precluded from employing such thoughts in a competitive enterprise.' *Koehring Co.* v. *E.D. Etnyre & Co.*, 254 F. Supp. [334, 355 (N.D. Ill. 1966)]. To do this would be to give insufficient weight to the employee's right to use 'the product of his knowledge acquired previous to [his] employment, and of the use of his faculties, skill and experience in the ordinary course of his employment . . . .' *New Method Die & Cut-Out Co.* v. *Milton Bradley Co.*, 289 Mass. at 282-283."

is more concerned about Strauman's knowledge of the intricacies of their business operation. However, absent any wrongdoing, we cannot agree that Strauman should be prohibited from utilizing his knowledge and talents in this area (see Restatement (Second) of Agency § 396, Comment b). A contrary holding would make those in charge of operations or specialists in certain aspects of an enterprise virtual hostages of their employers. Where the knowledge does not qualify for protection as a trade secret and there has been no conspiracy or breach of trust resulting in commercial piracy we see no reason to inhibit the employee's ability to realize his potential both professionally and financially by availing himself of opportunity."

3. I am constrained to add that I find no "temptation to hold Kroeger to the bargain which he so obviously understood." It would require that we restrict the contract to its words and eliminate the notion of reasonableness and good faith. See *Fortune* v. *National Cash Register Co.*, 373 Mass. 96 (1977). It would thus erode the well-settled law of contracts restricting competition which as the majority points out comes to us from the Sixteenth Century. Nor am I tempted, as the majority are, to make an analysis of contracts restricting competition in terms of the equality of bargaining power between the parties. Quite apart from the fact that nothing in the record indicates any equality in bargaining power, an inquiry on that basis would mire the courts in speculation as to whether the employee could get a new job and whether the employer could get a replacement — and perhaps as to the net worth of the parties. Further, quite apart from the equality of bargaining power such a "temptation" ignores the public interest motivating the analysis which has been used in these contracts since the Sixteenth Century. Such an analysis ignores that "[t]he 'right [of an employee] to use [his] general knowledge, experience, memory and skill' (*J. T. Healy & Son* v. *James A. Murphy & Son*, 357 Mass. 728, 740 [1970]), promotes the public interest in labor mobility and the employee's freedom to practice his profession and in mitigating monopoly. The law thus maxi-

mizes the benefit of the national store of skill and knowledge." *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 267. Indeed, as Blake points out, "[T]he loss to the individual and the economic loss to society are both greatest when a highly trained and specialized person is prevented from employing his special abilities." Blake, Employee Agreements Not to Compete, 73 Harv. L. Rev. at 684-685, quoted in *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 268. See also Note, Trade Secret Protection of Non-Technical Competitive Information, 54 Iowa L. Rev. at 1178, 1180.

I agree with the result reached in part 3 of the majority opinion and with part 4 of the opinion; I would therefore award Kroeger the entire $71,000 in retirement benefits.