[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION FOR A TEMPORARY INJUNCTION
STATEMENT OF THE CASE
This is an action instituted by the plaintiff, Industrial Technologies, Inc., seeking injunctive relief to enforce noncompete and nondisclosure provisions contained within an employment agreement signed by the defendant, Joseph Paumi. Pending before the court is the plaintiff's application for a temporary injunction.
"The issuance of an injunction and the scope and quantum of injunctive relief rests in the sound discretion of the trier."Krulikowski v. Polycast Corp., 153 Conn. 661, 669, 220 A.2d 444
(1966). "Injunctive relief may not lie where it is predicated on the fears and apprehensions of the party applying for it or where it would be incompatible with the equities of the case . . . . and likewise the power of equity to grant such relief may be exercised only under demanding circumstances. . . . The extraordinary nature of injunctive relief requires that the harm complained of is occurring or will occur if the injunctive relief is not granted. Although an absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable harm." Karls v. Alexandra RealtyCorp., 179 Conn. 390, 402, 426 A.2d 784 (1980). Irreparable harm inevitably results from a violation of a valid and enforceable noncompete provision. Mattis v. Lally,138 Conn. 51, 56, 82 A.2d 155 (1951).
The primary facts concerning the parties relationship and the employment agreement are not in dispute. Except for one brief interruption, from 1974 to 1996, the defendant was CT Page 6072 employed by a company called Intec Corporation (Intec). Intec started its business in 1971 and has continually maintained its headquarters in Connecticut. Intec's business involved the designing and selling of camera and laser inspection devices used by companies during the manufacturing process to identify product defects or nonconformities. Over the years, the defendant has held numerous positions with Intec. In 1974, he started with Intec as an engineer. By 1992, the defendant was Intec's Director of Marketing, in charge of the company's entire marketing and sales activities. In 1994, the defendant became the general manager of Intec.
In 1992, a company named Aerodyne Products Corporation (Aerodyne) purchased Intec. Aerodyne maintained its principal office in Massachusetts. After Aerodyne purchased Intec, it required all Intec managerial employees, including the defendant, to execute new employment agreements. The defendant received the employment agreement in 1992, but did not sign the agreement until May 5, 1994. This employment agreement contains the noncompete and nondisclosure provisions at issue in this case. In 1994, Aerodyne moved its headquarters to Connecticut, and changed its name to Industrial Technology, Inc., the plaintiff in this case.
In August 1996, the defendant resigned from Intec. His last day of employment was on or about August 17, 1996. Soon after his resignation, the defendant began to work for a company called Mayan Automation (Mayan). Mayan is the Intec's exclusive supplier of an inspection camera that Intec uses for one of its primary product lines. Mayan also has started selling this same inspection camera, with different application features, in the same markets as Intec. Hence, Mayan is a competitor of Intec, and thus, the plaintiff. From these facts, there is no dispute that the defendant's employment with Mayan violates the noncompete provision of his employment agreement with the plaintiff. The crux of the parties' dispute is whether the noncompete provision is enforceable, and if so, to what extent.
DISCUSSION
 I
The first issue presented is whether Connecticut law or Massachusetts law governs the employment agreement, and thus, the determination of the enforceability of the noncompete CT Page 6073 provision. The employment agreement provides under paragraph 6.2 that the agreement "shall be governed in accordance with the laws of the Commonwealth of Massachusetts." The parties agree that the courts of Connecticut and Massachusetts have adopted the rules on conflict of laws set forth in the Restatement of the Law, and under these rules, substantial weight and deference is required to be given to the parties' choice of law. Restatement (Second), Conflict of Laws § 187 (1971); see alsoElgar v. Elgar, 238 Conn. 839, 850 n. 10, 679 A.2d 973 (1996) ("in accordance with § 187 of the Restatement, parties to a contract generally are allowed to select the law that will govern their contract. . . .").
Yet, despite the weight and deference that is afforded to the parties' choice of law, the Restatement further provides that the parties' choice of Massachusetts law will be disregarded if either: 1) Massachusetts has no substantial relationship to the parties or transaction and there is no other reasonable basis for the parties' choice; or 2) the application of Massachusetts law would be contrary to a fundamental policy of Connecticut and Connecticut has a materially greater interest in the matter than Massachusetts. 1 Restatement (Second), supra, § 187; Elgar v. Elgar, supra, 238 Conn. 850.
In regard to the first test, the plaintiff asserts that Massachusetts law applies because Massachusetts has a substantial relationship to the parties and there is a reasonable basis for this choice. Plaintiff argues that this test is met because when the employment agreement was signed by the parties, the plaintiff was known as Aerodyne, Aerodyne was a party to the employment contract, and, Aerodyne was headquartered in Massachusetts.[1] See 1 Restatement (second), supra § 187 comment f (a substantial relationship between the chosen state and the parties may be established when one of the parties has its "principal place of business" in the chosen state).
Under the specific circumstances presented here, the court cannot find that the parties' choice of Massachusetts law was without a reasonable basis. The employment agreement was executed between the defendant and Aerodyne. In the agreement, Aerodyne, as the "Corporation," was defined to include "all entities directly or indirectly owned by, owning or under common ownership with it." This broad definition would include Aerodyne itself, Intec, and Aerodyne's other subsidiaries or CT Page 6074 divisions. Aerodyne had an interest in the competitive activities of the people employed by its subsidiaries and an interest in their knowledge about propriety information which could be used to compete against the businesses. Consequently, under the precise terms of the agreement, the scope of the noncompete provision was based on Aerodyne's business, not Intec's business — so that the defendant, for example, could not work for a competitor of Aerodyne for one year after the termination of his employment with Intec. The scope of this agreement is very broad, but Aerodyne's participation as a party to the agreement and its business activities in Massachusetts provide a reasonable basis for the parties' choice of Massachusetts law. Compare Northern States Power Co. v.International Telephone Telegraph Corp., 550 F. Sup. 108, 113
(D.Minn. 1982) (parties' choice of New York law disregarded when only contact with New York is that parent corporation of one party is headquartered in New York and parent corporation was not a party to the contract).
The second test under the Restatement is whether the parties' choice of Massachusetts law should be rejected because application of Massachusetts law would be contrary to a fundamental policy of the State of Connecticut. 1 Restatement (Second), supra, § 187(2)(b). Defendant emphasizes that under Connecticut law, noncompete provisions are restraints of trade that will only be enforced if they are reasonable. Robert S.Weiss Associates, Inc. v. Wiederlight, 208 Conn. 525, 530-31,546 A.2d 216 (1918); Scott v. General Iron Welding Co.,171 Conn. 132, 137, 368 A.2d 111 (1976). The Massachusetts policy on this issue is essentially the same — noncompete provisions are valid only to the extent that they are reasonable. E.g.,All Stainless, Inc. v. Colby, 364 Mass. 773, 308 N.E.2d 481, 484
(1974). As noted by the parties, the only pertinent difference between Connecticut and Massachusetts law with regard to the enforcement of a noncompete provision is the extent to which the courts are permitted to "blue pencil" a facially unenforceable noncompete provision so that it may be enforced. This different use of the so called "blue pencil" rule is explained by the Connecticut Supreme Court in Beit v. Beit, 135 Conn. 19563 A.2d 161 (1948).
In Beit, the plaintiffs sold two grocery businesses to the defendant, one in the City of Norwich and one in the City of New London, and as part of the sale, the plaintiffs agreed "not to engage in the meat market or grocery business within the limits CT Page 6075 of New London County" for thirty years. Id., 197. Subsequently, one of the plaintiffs desired to start a grocery business in New London County and brought a declaratory judgment action seeking a determination as to the enforceability of the noncompete provision. The trial court concluded that the noncompete provision was an unreasonable restraint of trade because the restriction was greater than necessary for the protection of the defendant's business. Id., 202.
On appeal, the defendant argued that the trial court should have at a minimum held the noncompete provision valid and enforceable as to Norwich, New London and the towns contiguous thereto where the defendant's business primarily operated. The Supreme Court rejected the defendant's argument that the noncompete provision could be enforced with limitations on the scope of the geographic restriction. Id., 202-05. The court concluded that severance is supported by the parties' intent and represents a fair construction of a contract when the noncompete provision consists of several distinct covenants, but not when a provision is essentially an entirety. The court explained the rule as follows:
 "A restrictive covenant which contains or may be read as containing distinct undertakings bounded by different limits of space or time, or different in subject-matter, may be good as to part and bad as to part. But this does not mean that a single covenant may be artificially split up in order to pick out some part of it that can be upheld. Severance is permissible only in the case of a covenant which is in effect a combination of several distinct covenants." Where the covenant is intended by the parties to be an entirety, it cannot properly be so divided by a court that it will be held good for a certain area but invalid for another; indeed, as the trial court well states in its memorandum of decision, this would be to make an agreement for the parties into which they did not voluntarily enter.
Id., 205, quoting Pollock, Contracts (11th Ed.), p. 335.
Thus, on the facts in Beit, the court held that the provision restricting competition "within the limits of New London County," was an entirety, and the court could not enforce the provision by limiting the scope of the geographic CT Page 6076 restriction to specific towns not expressly delineated in the parties' agreement. Id., 204-05. In reaching this holding, the supreme court explicitly rejected a broader rule of construction adopted by Massachusetts cases, which allows a court to enforce a noncompete provision to the extent reasonable even when the objectionable restriction may be regarded as being indivisible. Id. 204. Massachusetts cases applying this broader position include the following: All Stainless, Inc. v. Colby, supra, 308 N.E.2d 484-85 (1974) (covenant precluding competition from ex-employee in New England and New York was held enforceable only within employee's former sales territory); Cedric G. ChasePhotographic Laboratories, Inc. v. Hennessey, 327 Mass. 137,97 N.E.2d 397, 398 (1951) (geographical restriction reduced from fifty miles to thirty-five miles); Wells v. Wells,9 Mass. App. 321, 400 N.E.2d 1317, 1321 (1980) (restraint unlimited in
time reduced to fifty-two months); see also, P. Jerome Richey,Covenants Not To Compete: A State-by-State Survey, p. 300 (1991) (Massachusetts courts "are not limited by the blue-pencil doctrine, as strictly construed, to the strict divisibility or excision of certain parts of words in the covenant").
The defendant insists that this difference between the laws of Connecticut and Massachusetts is a sufficient reason to reject application of Massachusetts law. However, as described in Beit, these different views regarding the application of the "blue pencil" doctrine are matters involving different rules of contract interpretation or construction, rather than different principals of fundamental public policy. See Beit v. Beit,supra, 135 Conn. 204-205;, Timenterial, Inc. v. Dagata,29 Conn. Sup. 180, 185, 277 A.2d 512 (1971 Armentano, J.) (explaining that the Massachusetts rule is rejected because it would require the court to "write out a new contracts for the parties"); see generally, 6A A. Corbin, Contracts (1962) §§ 1390 1394; 14 S. Williston, Contracts (3rd ed. 1972) § 1647C. Indeed, thepolicies of Connecticut and Massachusetts are essentially the same — noncompete provisions are not enforceable if they are unreasonable and are only enforceable to the extent they are reasonable.
Concededly, the Massachusetts "blue pencil" rule sanctions greater court involvement to make otherwise objectionable noncompete provisions reasonable and enforceable. Such a rule, however, does not foster the enforcement of noncompete provisions that violate Connecticut public policy. The defendant cannot seriously contend that a noncompete provision CT Page 6077 restructured and construed to be reasonable under Massachusetts law would be viewed as being "unreasonable" under Connecticut law. Thus, the true essence of the defendant's argument is not that the use of Massachusetts law would violate a fundamental public policy of Connecticut, but that such use may result in a more limited, entirely reasonable enforcement of the parties' noncompete provision as compared to a complete invalidation of the provision. In this regard, the defendant's position conflicts with the comments of the Restatement: "The forum will not refrain from applying the chosen law merely because this would lead to a different result then would be obtained under the local law of the state of the otherwise applicable law. Restatement (Second), supra, § 187, comment g.
The court's conclusion that the use of the Massachusetts "blue pencil" rule does not trespass upon a Connecticut public policy is supported by the Fourth Circuit's decision in BarnesGroup, Inc. v. CS Products, Inc., 716 F.2d 1023 (4th Cir. 1983). In Barnes, the court held that although the "reasonableness" test of the jurisdictions having the most significant contacts with the parties' transactions (Maryland, Louisiana and South Carolina), might not be identical to that of the parties' chosen state, Ohio, such differences were insufficient to warrant rejection of Ohio law on public policy grounds. Id., 1032. The court applied Ohio law even though the other jurisdictions did not follow the broad "blue pencil" rule adopted in Ohio. The court, however, did not expressly address whether these variants of the "blue pencil" rule represented a "difference in degree or in approach." Id., 1032 n. 24.
The court therefore concludes that the application of the Massachusetts "blue pencil" rule will not result in the enforcement of a noncompete provision that would violate a fundamental public policy of this state that is created by either Connecticut statute or caselaw. To that extent, the cases relied upon by the defendant are distinguishable. InGeneral Medical Corp. v. Kobs, 179 Wis.2d 422, 507 N.W.2d 381
(Wis.App. 1993), Wisconsin policy was established by a statute that made noncompete provisions illegal and unenforceable "even as to so much of the [provision] . . . as would be a reasonable restraint." Id., 507 N.W.2d 382-83 n. 2. The Wisconsin statute was enacted to supersede contrary Wisconsin caselaw that had adopted the Massachusetts "blue pencil" rule. Thus, the use of the Massachusetts "blue pencil" rule in Wisconsin would have violated the policy created by the statute. CT Page 6078
Similarly, in Dothan Aviation Corp. v. Miller,620 F.2d 504, 506-07 (5th Cir. 1980), the court concluded that the "blue pencil" theory of Alabama law contravenes the public policy of Georgia as found by the Georgia Supreme Court. The court noted that the Georgia Supreme Court has rejected the use of any "blue pencil" rule, and thus, a noncompete provision "should be enforced as written or not at all without any severance possibilities." Id., 507. The absolute terms, "enforced as written or not at all," elevate the nonuse of the "blue pencil" rule to a matter of substance utilized to protect a recognized public policy. Id., n. 4. In comparison, there is no "as written or not at all" rule in Connecticut, as Connecticut courts exercise a narrow "blue pencil" rule to sever divisible covenants. See Beit v. Beit, supra, 135 Conn. 204-05.
Hence, Connecticut, as Massachusetts, uses a rule of construction to transform an unreasonable noncompete provision into a reasonable provision. The defendant has not cited to, and the court has not found, a Connecticut public policy that would be violated by a Connecticut court enforcing a noncompete provision made reasonable by the court wielding the broad "blue pencil" rule utilized by Massachusetts law.
In summary, under the provisions of the Restatement, the parties' choice of law will be accepted and Massachusetts law will be applied to govern the validity and enforcement of the parties' agreement.
 II
As previously indicated, under Massachusetts law, a noncompete provision is enforceable if it is reasonable. The reasonableness of a particular agreement is governed by the facts of each case and requires an evaluation of all the pertinent circumstances. See All Stainless, Inc. v. Colby,supra, 308 N.E.2d 485. The general factors considered in evaluating the reasonableness of a noncompete provision include whether the agreement is: necessary to protect the legitimate business interests of the employer; reasonably limited in time and space and subject matter; and, consistent with the public interest. See, e.g., Novelty Bias Binding Co. v. Shevrin,342 Mass. 714, 175 N.E.2d 374, 375-76 (1961).
A CT Page 6079
First, the court rejects defendant's blanket argument that the parties' agreement is completely unenforceable because it in no way protects Intec's (the defendant's employer) good will, but instead, only restrains ordinary competition. See AllStainless, Inc. v. Colby, supra, 308 N.E.2d 484 (restraint must protect employer's good will and not merely be a restraint on ordinary competition). The court credits plaintiff's evidence that its competitive advantage in the industry is in part based on its specialized knowledge and ability to apply and adopt available systems to the unique or specific needs of its customers. Its customer lists and actual customer leads are proprietary and not generally known. Moreover, the defendant worked with Intec for over twenty years during which time he became general manager and acquired responsibility for the company's marketing and sales operation in this country and abroad. He certainly must have acquired information about these issues which was unique to his status with the company. As explained below, while the Court agrees that aspects of the non-competition agreement are so broad that they do not reasonably protect plaintiff's legitimate business interests, the Court wholly rejects defendant's argument that Intec does not have any good will or confidential information to protect. See AllStainless, Inc. v. Colby, supra.
The defendant's next argument against the enforceability of the agreement is that it fails for lack of consideration. On the basis of the evidence presented, which in part involves an evaluation of the witnesses' credibility, the Court rejects this argument and concludes that the agreement is supported by adequate consideration. First, the defendant was an employee at will, and before the defendant signed the agreement at issue, he had signed an employment agreement in 1985. The 1985 employment agreement was signed when the defendant returned to work for Intec after leaving for a brief time. The 1985 employment agreement contained a noncompete provision and also provided that the employment agreement could be extended or modified by the mutual written assent of the parties. There is no dispute that the 1985 employment agreement was supported by Intec's promise to employ the defendant; see Sherman v. Pfefferkorn,241 Mass. 468, 135 N.E. 568, 569 (1922) (employment is adequate consideration for a noncompete provision); and there is no doubt that this agreement, supported by adequate consideration, could be modified by the 1994 agreement. Under these circumstances, mutual modification of a legally binding agreement does not have CT Page 6080 to be independently supported by additional consideration. SeeHarrison v. City of Tampa, 247 F. 569, 571-72 (S.D.Fla. 1918) (where original contract provides that the parties may modify the contract, the original consideration supports the modification); see also Gabhard v. Royce Aluminum Corp.,296 F.2d 17, 19 (1st Cir. 1961) (since employer could discharge employee at will at any time, employer could equally initiate modifications to an employment contract at any time, except as to accrued matters, and the employee can accept the new conditions or quit).
Furthermore, the defendant was an at will employee when Aerodyne purchased Intec in 1992. Aerodyne predicated his employment with the company on his executing the 1994 agreement. Under Massachusetts law, the signing of the agreement to maintain continued employment provides adequate consideration for the agreement. See Slade Gorton Co. v. O'Neil,355 Mass. 4, 242 N.E.2d 551, 554 (1968) (the court assumed that employment agreement signed eight months after the start of employment was supported by valid consideration); Sherman v. Pfefferkorn,supra, 135 N.E. 569 (employment agreement signed two months after employee started work supported by employer's promise to employ him thereafter); see also Larson v. Jeffrey-Nichols MotorCo., 279 Mass. 362, 181 N.E. 213, 214-15 (1932) (new owner of business not bound by employment contract entered into by former owner of the same business).
Thirdly, the employment agreement was signed under seal. Under Massachusetts law, adequate consideration is conclusively presumed for agreements signed under seal. Marine ContractorsCo. v. Hurley, 365 Mass. 280, 285 (1974).
 B
The defendant further argues that the precise provisions of the parties' noncompete provision are so broad that enforcement of the provision in its entirety would offend public policy. The court agrees.
First, the scope of the noncompete provision is very broad because it is not governed by the business activities of the defendant's employer, Intec, but by the business activities of Intec's parent or umbrella company, the plaintiff. The plaintiff's business concerns are obviously more extensive than Intec's activities. The business interests which the plaintiff CT Page 6081 is most interested in protecting, however, are those which the defendant has the greatest ability to exploit — which are those based on the defendant's years of employment with Intec. Although the evidence did not establish whether Intec is a division of the plaintiff or a separate subsidiary, the record is clear that the defendant was an employee of Intec only. Thus, Intec was the actual entity which provided the consideration to support the employment agreement. This is not to say that the defendant had insignificant contacts with the plaintiff and its other affiliated companies or that the plaintiff has no interest in the noncompete provision. The point here is that the scope of the provision covers business activities so far beyond the defendant's actual employment activities with Intec that the restraint is not entirely consistent with the protection of the good will which the defendant reasonably threatens.
The very broad scope of the noncompete provision is also evidenced by the fact that the provision is not limited to plaintiff's actual or potential competitors. Under the provision, the defendant is precluded from working with a competitor, as well as for anyone who is or ever has been a "client, customer, consultant, collaborator or supplier" of the plaintiff. The defendant is also precluded from being employed by any enterprise involved with any product, process or service that the plaintiff has either engaged in or even "had under consideration" during his period of employment. Contrary to the plaintiff's characterization, the provision does not "merely restrain the defendant from working for a creditor". It precludes him from working with any employer whose business overlaps with the plaintiff's actual or contemplated business activities, irrespective of any competition between the new employer and the plaintiff.
 C
Additionally, the parties' noncompete provision does not contain any geographic limitation. The plaintiff contends that because of its "worldwide" operation, any geographic limitation would be insufficient to protect its business interests and good will around the world. The problem with this contention is that while plaintiff has operations in various parts of the world, it does not have operations in every part of the world. Plaintiff's business is about equally divided among the areas of Asia, Europe and the Western Hemisphere. These areas certainly do not CT Page 6082 constitute the entire the world. Moreover, the evidence does not indicate that the plaintiff actually does business in every country in these areas.
A noncompete provision that has worldwide application has been held not to be a per se violation of public policy. SeeMixing Equipment Co. v. Philadelphia Gear, Inc., 436 F.2d 1308
(3rd Cir. 1971). Nonetheless, because of the breadth of such a provision, the other terms of the provision must be very narrowly drawn and clearly defined in order to insure that the overall provision is reasonable.
In the present case, the excessive scope of the noncompete provision; the absence of any geographic limits; and, the one year enforcement period, all combine to make the terms of the noncompete provision unreasonable. The plaintiff has not cited any case, and the court has not located any case, enforcing a noncompete provision with such extensive and expansive characteristics.
The plaintiff heavily relies on the Third Circuit's decision in Mixing Equipment Company v. Philadelphia Gear, Inc.,supra, 436 F.2d 1308, which enforced a one year, worldwide noncompete provision. The provision in Mixing Equipment,
however, was much more limited in scope than the one presented here because it only precluded the defendant from the working in the precise field of his former employment; and only restricted him from working for any concern connected with products in actual competition with those products sold or made by his former employer. Accord Business Intelligence v. Hudson,580 F. Sup. 1068 (S.D.N.Y 1984) (one year, worldwide restriction was limited to businesses "in competition" with the employer); see also, Gillette Company v. Williams, 360 F. Sup. 1171 (D.Conn. 1973) (two year limitation precluding work in the United States involving safety razors or blades was valid when the employer was required to pay one half of the employee's salary if the restriction was enforced).
 D
As discussed earlier, Massachusetts courts have exercised rather broad discretion to reconstruct objectionable noncompete provisions to make the restrictions reasonable and the provisions enforceable. See Cheney v. Automatic Sprinkler Corp.of America, 377 Mass. 141, 385 N.E.2d 961 (1979); All Stainless,CT Page 6083Inc. v. Colby, supra, 308 N.E.2d 485; Wells v. Wells, supra, 400 N.E.2d 1320-21; Kroeger v. Stop Shop Companies, Inc.,13 Mass. App. 310, 432 N.E.2d 566, 571, reh. denied, 440 N.E.2d 1175
(1982) (time restriction of "so long as [the employee] lives" was reduced to one year). When restructuring the limits of a covenant not to compete, the Massachusetts courts often focus on the geographic and time limitations of the agreements. Id. A geographic restraint that is very broad may be valid if imposed for a short time and a narrow geographic restraint may be valid for a longer time. These considerations lead the court to conclude that enforcement of the noncompete provision can only be considered reasonable and enforceable if the scope of the agreement, the geographic limits, and, the enforcement period are reduced.
Therefore, the court holds that, under Massachusetts law, the parties' noncompete provision is reasonable, and thus, enforceable, providing its scope is limited as follows: The geographic area of the agreement is limited to the plaintiff's presently existing markets in Asia, Europe and the Western Hemisphere. The enforcement of the noncompete provision shall be limited to ninety days, from the date of the defendant's resignation. Additionally, the language of the covenant precluding the defendant from working with individuals who are only consultants, collaborators or suppliers of the plaintiff shall be deemed unenforceable as being beyond the reasonable scope of the plaintiff's legitimate business interests.
 III
The plaintiff also seeks injunctive relief to enforce the provisions of the employment agreement precluding the defendant from revealing or using the plaintiff's confidential information. The defendant does not contest the validity of these provisions, but argues that the plaintiff has failed to meet its burden of proof that injunctive relief is necessary to enforce them. Except as discussed below, the court agrees with the defendant that the plaintiff has not identified any confidences or secrets actually known by the defendant or subject to improper disclosure warranting injunctive relief. Injunctive relief is an extraordinary remedy and should only be issued in a manner so that a defendant clearly knows what he is required to do to accomplish full compliance with the order.
The areas where plaintiff has met its burden is in regard CT Page 6084 to plaintiff's customers and customer prospects. The record establishes that the defendant's position with Intec allowed him to acquire information on these matters which are not generally available to the public. This information is confidential information of Intec and would be harmful to Intec's legitimate interests if disclosed to competitors such as Mayan. Furthermore, the defendant's position with Mayan provides an incentive for him to take advantage of this information and the evidence indicates that the defendant would be inclined to use or disclose this information in the absence of an injunction. Therefore, a preliminary injunction shall issue enjoining the defendant from disclosing or using any of this confidential, proprietary information.
A hearing shall be scheduled forthwith so that the parties may be heard on the precise terms of the preliminary injunction to be issued in accordance with this decision.
STEVENS, J.