Garsh, J.
Plaintiffs, Boston Police Patrolmen’s Association, Inc. (“the Association”)[3] and Richard Bradley, James Carnell, Robert Duggan and Michael O’Hara, on their own behalf and as representatives of all those similarly situated, and plaintiffs-intervenors, Boston Police Detectives Benevolent Society, Inc. (“the Society”)[4] and John Rogers, Dennis Harris, and Joseph Geary, on their own behalf and as representatives of all those similarly situated, bring this action seeking damages allegedly resulting from the violation of Massachusetts’weekly wage law, G.L.c. 149, §§148 and 150, by defendants, the City of Boston (“the City”) and the Boston Police Department (“the Department”). Injunctive and declaratory relief is sought as well. Plaintiffs and plaintiffs-intervenors allege that, prior to January of 1996, the defendants violated the state weekly wage law by failing to timely transmit employee deferred compensation plan deductions to designated plan coordinators.
This Court (Roseman, J.) ordered that the trial of this action be bifurcated, with liability to be tried before damages. Subsequently, the parties submitted a joint statement of agreed facts comprising all of the facts deemed material by the parties to a determination of liability, together with supporting exhibits, and the court heard oral argument as to the sole legal issue — whether deferred compensation deductions constitute “wages” within the meaning of G.L.c. 149, §148. For the reasons stated below, the plaintiffs are not entitled to relief.
AGREED FACTS
The City offers a deferred compensation plan to its employees pursuant to G.L.c. 29, §64B. Participation in the plan is voluntary. Those employees who opt to participate in the plan designate a percentage of their annual base pay to be invested in one or more of several tax-deferred funds. The City transfers employee plan deductions to certain plan coordinators.
Each employee participating in the plan completes a Payroll Authorization Card for filing with the plan coordinator. That card indicates the amount of money to be deducted from the employee’s paycheck. Every employee who opts to participate in the plan also completes a Participation Agreement for filing with the plan coordinator. The terms of that contract include the following:
You’ve agreed to reduce your salary. By signing this form, you authorize your Employer to reduce your salary or wages in amounts equal to the Employee Contributions that you’ve specified. Your Employer will use these amounts to make the contributions to your Plan Account. . .
Plan withdrawal restrictions: Because your Plan is designed to help you save for your retirement, the tax law imposes certain withdrawal restrictions on your Plan money. You won’t be permitted to get any money out of the Plan until after you permanently leave work for your Employer. You may get a limited withdrawal if you have a severe financial hardship that is approved by the Plan Administrator. You must understand that you shouldn’t participate in the Plan if you don’t have enough savings for regular expenses.
Deferred compensation is not your property. To get its tax advantages, your Plan requires that each investment (including any life insurance contract) is the exclusive property of your Employer. While your Employer intends to hold your Account solely to invest your Deferred Compensation and then make Plan payments to you, to meet tax Code rules, your Plan Account can’t be legally restricted.
Compliance with Internal Revenue Code. You agree that your Employer . . . can take any action that may be necessary to ensure that your participation in your Plan is in compliance with any applicable requirement of the Internal Revenue Code.
(Emphasis in original).
An employee who participates in the plan chooses the amount of the deduction and the type of investment vehicle, such as an annuity or mutual'fund, into which the deduction is to be deposited. The plan coordinator then notifies the City of the employee’s enrollment in the plan and the amount of that employee’s designated deduction.
In the early 1970s, the City offered a deferred compensation plan with Variable Annuity Life Insurance Company (“VALIC”), Aetna, and Security First as plan coordinators. Later, the City offered investors a deferred compensation plan through PEBSCO as the plan coordinator. Existing investors were permitted to continue to invest through VALIC, Aetna, and Security First. In 1994, the City began to utilize the services of the Commonwealth’s deferred compensation plan, and, through that plan, investors could invest through Copeland Companies (“Copeland”). Existing investors were permitted to continue with VALIC, Aetna, Security First, and PEBSCO as plan coordinators.
The City currently utilizes the services of the state’s deferred compensation plan pursuant to the terms of an agreement between the City and the Commonwealth (“the Agreement”). The Agreement provides that all amounts of the compensation deferred under the City’s plan, although invested in accounts in the name of the Commonwealth, “shall remain (until made available to the participant or other beneficiary) solely the property and right of the [City of Boston], subject only to the claims of the [City of Boston’s] general creditors.” The Commonwealth’s plan operates pursuant to the terms of the Deferred Compensation Plan Document (the “Document”). The Document also states that *13 all assets of the plan, Including all deferred amounts, shall remain solely the property and rights of the employer Until made available to the participant or beneficiary subject only to the claims of creditors of the employer. It further states that the rights of the participant shall be those of a general creditor of the employer. Since 1994, Copeland has coordinated the deferred compensation investments of the City’s employees under the Deferred Compensation Plan Contract between Copeland and the Commonwealth. Beginning in 1994, employees who invested through VALIC, Aetna, Security First, or PEBSCO could change to Copeland by forwarding a completed Copeland deduction card to Copeland, which then would notify the City of the employee’s participation and the amount of the designated deduction.
The Department’s employees receive weekly paychecks. The pay period is Wednesday to Tuesday. The Department’s payroll department, on a weekly basis, submits a payroll document for all Department employees to the City’s Auditing Department. After auditing the payroll, the City Auditor prepares a signed warrant indicating approval of the payroll. On Thursday of every week, the Treasury Department (“Treasury”) receives the warrant for the Department’s payroll covering the pay period ending on Tuesday of that week. The payroll, along with payrolls from other City departments, is then transmitted to the City’s Management Information Systems Department (“MIS”), which processes the payroll through a computer and prepares unsigned, undated paychecks. The checks are usually prepared by MIS on Wednesday or Thursday, but sometimes Friday, for the pay period ending the previous Tuesday. The checks are then transmitted to Treasury, where they are signed and dated. Treasury then allocates the funds for the paychecks by transferring money from the City’s General Fund bank account or accounts to the bank account or accounts from which the paychecks are drawn. Treasury thereafter distributes the paychecks to the Department’s employees, who receive their paychecks on Friday for the pay period ending the previous Tuesday.
The Department’s payroll indicates the type, number and amount of deductions from each employee’s paycheck, including, but not limited to, income tax, insurance premium payments, and deferred compensation payments. The amount of money which the Treasury transfers from the General Fund account or accounts into the account from which paychecks are drawn does not include the amount of any paycheck deductions.
Prior to January 1996, the City employed the following procedures for transfer of deferred compensation deductions. After processing all of the City’s payrolls for the week for the City’s approximately twenty thousand employees, MIS prepared a deduction report that indicated the amount of money to be deducted from each department’s payroll for particular items. With regard to deferred compensation deductions, MIS prepared a list indicating each department and the total amount of deferred compensation deductions for all employees in that department. In 1995, approximately 3,500 to 4,000 employees participated in the deferred compensation plan in any given week. MIS transmitted the deduction report to Treasury on Friday for the pay period ending the previous Tuesday.
Treasury would then divide the report into a list of individual plan coordinators receiving deductions, reconcile the information in the report, and determine the specific amount of money to be transferred to each different plan coordinator. Treasury completed this process no later than the following Monday unless there was an intervening holiday. Treasury then prepared a “special draft,” or payment form, in the amount of the total deduction for all the plan coordinators and would thereafter transmit the draft to the Auditing Department on Tuesday or Wednesday of the week next following the end of the pay period.
The Auditing Department processed the special draft as part of the entire accounts payable system. When all the accounts payable were processed, the Auditing Department instructed MIS to generate a check for the entire amount of the deferred compensation deduction. A check could not be issued as part of the accounts payable system until all information required to issue all checks that were part of that system was received.
MIS transferred the check to Treasury, which received it approximately ten days after preparing the “special draft.” Treasury deposited the check into a payroll account, determined how much money to transmit to each investment company, issued individual checks for the various plan coordinators, and mailed those checks to the coordinators with a list of deductions broken down by participating employees.
The Document dictates that deferred compensation deductions shall be invested by the plan coordinator “as soon as administratively feasible.” It is the goal of the plan coordinators to invest the deductions within 48 hours of receipt of the checks.
Prior to January of 1996, the plan coordinators generally did not receive employees’ deferred contributions within one week of the payroll date. The amount of time it took for plan coordinators to receive deferred compensation deductions varied. On occasion in 1994 and 1995, it was as long as five weeks.
Copeland also coordinates investments for some employees of the Massachusetts Water Resources Authority, Massachusetts Bay Transportation Authority, and the City of Worcester. As of 1995, Copeland generally did not receive deferred compensation deductions from those entities within seven days of the termination of each payroll date.
*14 In March of 1995, Copeland wrote to the Treasurer of the City of Boston requesting that the City change the method by which it transferred deferred compensation deductions to Copeland in order to reduce the amount of time between payroll date and receipt of money by Copeland. At some point, Aetna made a similar request. City officials from the Treasury and Auditing Departments began discussions about how the procedure for transferring money could be changed. In January of 1996, representatives of the plaintiffs and the defendants met to discuss the plaintiffs’ concerns regarding perceived delays in the transfer of deferred compensation deductions to plan coordinators. In January of 1996, the City altered the practice used to transfer deferred compensation contributions to some of the plan coordinators, including Copeland. Under the new method, the City transmits the deduction information by tape, wire or facsimile, and then the City transfers the deduction funds directly from the General Fund bank account. The City may continue to pay some of the investment companies by mailing a check for the amount of the deductions. The use of electronic transfers has reduced the time it takes to transfer deferred compensation contributions to Copeland to an average of five to ten days from the date of the payroll.
RULINGS OF LAW
General Laws c. 149, §148 requires defendants to pay to every employee “the wages earned by him . . . within seven days of the termination of the pay period during which the wages were earned if such employee is employed seven days in a calendar week . . .[5] If deferred compensation constitutes “wages” within the meaning of section 148, the defendants had an obligation to transfer plaintiffs’ deferred compensation deductions to the plan coordinators within the time period prescribed by section 148. It is undisputed that the defendants did not always do so.
Neither the definition section for the chapter, G.L.c. 149, §1, nor section 148 itself defines the term “wages.” Accordingly, this court must interpret the statute to give meaning to that word. Interpretation of a statute is a question of law for the court. Corsetti v. Stone, 396 Mass. 1, 12 (1985). A court interprets a statute “according to the intent of the legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.” Champagne v. Champagne, 429 Mass. 324, 326 (1999).
The Legislature enacted section 148 to limit “the interval between the completion of a work week and the payday on which the wages earned in that week will be paid.” American Mutual Liability Insurance Co. v. Comm’r of Labor & Industries, 340 Mass. 144, 145 (1959). Since the statute’s enactment in 1886, its many amendments make clear that it deals with the weekly payment of wages. Id. at 147. Its passage sought “primarily to prevent unreasonable detention of wages . . . The cure which the Legislature prescribed for the evil noted was to require regular and frequent payment . . . Payment long in arrears could mean . . . dissipation on payday of a large part of the accumulated sums by irresponsible employees with consequent adverse effect on family and community. The statutory remedy met this possible evil . . .” Id. (emphasis in original). The Legislature deemed it important that employees receive wages regularly and promptly after they had been earned. Mutual Loan Co. v. Martell, 200 Mass. 482 (1909). The object which the Legislature sought to be accomplished with section 148 does not require that it encompass deferred compensation deductions which are funds that are neither actually nor constructively received by an employee.
The deferred compensation plan at issue is governed by General Laws c. 29, §64B, added by St. 1988, c. 319, which provides that the Commonwealth and its subdivisions “may contract with an employee of such governmental body to defer a portion of an employee’s compensation and may, for the purposes of funding a deferred compensation program for said employee, established in accordance with the U.S. Internal Revenue Code (the “Code”), invest the deferred portion of the employee’s income to a life insurance or annuity contract, mutual fund, or a bank investment trust.” Thus, a deferred compensation plan established pursuant to c. 29, §64B is governed by 26 U.S.C. §457. That federal statute provides that monies contributed to deferred compensation plans are not taxed at the time of deferral. In order to offer this federal tax benefit to its employees, the entity establishing the deferred compensation plan is required to ensure that, under the plan document, all monies contributed to such a plan “shall remain (until made available to the participant or other beneficiary) solely the property and rights of the employer . . . subject only to the claims of the employer’s general creditors.” 26 U.S.C. §457(b)(6).[6] The statutory language prior to its amendment in 1986 does not differ in any way significant or relevant to this case. The Agreement and Document contain the language required by section 457(b)(6).
By federal statute, therefore, all compensation deferred under an authorized plan, such as one created pursuant to c. 29, §64B, is solely the property of the employer and not that of the employee until the funds are distributed to the participant. At that point, they become income of the employee. Prior to distribution to the employee, the funds cannot be the property of the employee. If they are the employee’s property, then the plan would comport with neither the governing federal nor state statute. Accordingly, deferred compensation plans involve not the transfer of wages to a designated plan coordinator but the reduction of wages in an amount equal to the employee contribu *15 tion specified by the employee, with the understanding that the City will invest the amount withheld, which is propertyof the City, and then make plan payments to the employee. Wages, by contrast, are money to which the employee has an absolute and vested right; it is “his property . . . not subject to any limitation, contingency, or delay.” Campbell v. Boston, 290 Mass. 427, 430 (1935). An employee is entitled to his property, and section 148 ensures that the employee receives his property, in the form of wages, within seven days of the termination of the pay period during which the wages were earned. The Legislature’s explicit inclusion of vacation and holiday pay as “wages” under section 148 further evidences an intent to limit the definition of “wages” in the weekly wage law to monies that are considered the property of the employee and which can be paid immediately to an employee or at least within seven days. See G.L.c. 149, §148.
Plaintiffs’ argument that 26 U.S.C. §457 creates a legal fiction which should be ignored is not persuasive. Plaintiffs have elected to secure for themselves the not inconsiderable tax benefits of deferring their compensation, a benefit which is available only if all amounts of compensation that are deferred shall remain solely the property of the employer until made available to the participant or other beneficiary, subject only to the claims of the creditors of the employer. Nothing in the federal statute suggests that the statutory pre-requi-site for a valid plan is an empty requirement designed to lack all meaning. Indeed, as the plaintiffs themselves concede, “(gliving the participants any more legal rights than provided in the Code and the plan documents . . . would jeopardize continued compliance with the Internal Revenue Code and destroy the tax break to the participants.”
Moreover, c. 29, §64B explicitly provides that “[a]ny compensation deferred under such a plan shall continue to be included as regular compensation, as defined in [c. 32, §1 ], for the purpose of computing any retirement and pension benefits earned by any such employee,[7] but any compensation so deferred shall not be included in the computation of any taxes withheld on behalf of any such employee.” The Legislature chose not to provide that “any compensation deferred under such a plan shall be included as wages, as defined in G.L.c. 149, §148.”[8] Just as the Legislature was aware of c. 32, §1 when it enacted the law governing deferred compensation, so too it presumably was aware of section 148. See Green v. Wyman-Gordon Co., 422 Mass. 551, 554 (1996) (Legislature assumed to be aware of existing statutes when enacting subsequent ones).
Plaintiffs also argue that since the Legislature knew how to carve out an exception to the weekly wage law for union dues, G.L.c. 154, §8, added by St. 1933, c. 96 (giving employers fourteen days to transfer dues from an employee’s earned wages to his union), its failure to make a similar exception for deferred compensation in 1988 signifies the Legislature’s intent to subj ect deferred compensation to the weekly wage law. Unlike deferred compensation deductions, union dues are an employee’s property prior to their receipt by the union. While dues are deducted from wages, the employee has not chosen to reduce, that is to diminish, his wages, but only to direct that a portion of those wages be paid to the union. Here, on the other hand, no amount is deducted for deferred compensation until the employee elects to reduce his wages and then the amounts chosen by the employee to be deferred is solely the property of the employer until made available to the employee or other beneficiary. Presumably the Legislature did not exempt deferred compensation from the weekly wage law because it did not consider deferred compensation to be “wages” governed by §148.
The definitions of “wages” in G.L.c. 151A, §l(s)(A), in the context of calculating unemployment benefits,[9] and in G.L.c. 152, §1(1), in the context of calculating workers compensation,[10] also do not signify a legislative intent to bring deferred compensation with the ambit of the weekly wage law. Although all three statutes are remedial in nature, the purpose of c. 149, §148 is quite different from that of the other two statutes. Section 148 serves to ensure that employers pay their employees regularly and frequently, namely, weekly. Chapters 151A and 152 seek to compensate employees based on a calculation of an employee’s total losses. Moreover, the fact that c. 151A and c. 152 each has a different definition of wages demonstrates that there is no single definition of that term that should be applied to any statute in which the term is not defined.
Finally, the fact that the amounts withheld for transfer to the plan coordinators represent compensation that was earned from personal services does not mean that the sums so earned constitute “wages.” Not everything that is earned is a wage. See, e.g., Hopkins v. Kansas City, Missouri, 894 S.W.2d 156, 158 (Mo. 1995) (holding that, under a statute authorizing tax on “salaries, wages, commissions and other compensation earned,” deferred compensation “plainly” falls within the category of “other compensation”). Molter v. Dep’t of Treasury, 505 N.W.2d 244 (Mich. 1993), upon which the plaintiffs rely, decides the applicability of a Michigan tax on the “income” of a nonresident earned for the rendition of personal services performed instate to distributions that were paid to a former resident from a deferred compensation account. The court held that contributions to the deferred compensation plan represented income for personal services performed in Michigan and did not cease to be such by virtue of disbursement being deferred and ultimately being paid out of state. Id. at 247. Although the court refers to the contributions as a portion of the “wages” received as an employee, nothing in the action turned on whether the contributions that had been deferred *16 constituted “wages” or some other form of compensation for personal services. In the instant case, there is no argument that the contributions to the plan represent amounts that had been earned for personal services. Whether those earned contributions constitute “wages” governed by a weekly wage statute is a question not addressed by Molter. Another case upon which the plaintiffs rely, Kroeger v. Stop & Shop Companies, Inc., 13 Mass.App.Ct. 310 (1982), simply holds that an “employee’s deferred compensation benefits should not be forfeited to the extent those benefits have been earned, even though the employee violates a valid post employment restriction!, a non-competition provision].” Id. at 321. The import of Kroger is that deferred compensation is “earned.” The weekly wage statute applies only to “wages” and not to all forms of earned compensation.
In sum, taking into account the ordinary usage of the term “wages” and the evil sought to be remedied by the passage of c. 149, §148, and reading that statute together with c. 29, §64B, the court concludes that the amounts at issue are not “wages” within the meaning of section 148. Accordingly, the plaintiffs are not entitled to damages or to the injunctive or declaratory relief which they have sought.[11]
ORDER
For the foregoing reasons, it is hereby ORDERED that judgment enter for defendants.

The Association is the exclusive collective bargaining representative for police patrol officers employed by the City of Boston in the Boston Police Department.

The Society is the exclusive collective bargaining representative for police detectives employed by the City of Boston in the Boston Police Department.

Genera1 Laws c. 149, §150 provides an employee aggrieved by a violation of G.L.c. 149, §148 with a cause of action for “any damages incurred, including treble damages for any loss of wages and other benefits." G.L.c. 149, §150.

Specifically, 26 U.S.C. §457(b)(6), as amended by Pub. L. 99-514, Tide XI, §1107(a), (c), Oct. 22, 1986, 100 Stat. 2426, 2430, provides the following:
For purposes of this section, the term “eligible deferred compensation plan” means a plan established and maintained by an eligible employer . . . which provides that—
(A) all amounts of compensation deferred under the plan,
(B) all property and rights purchased with such amounts, and
(C) all income attributable to such amounts, property, or rights,
shall remain (until made available to the participant or other beneficiary) solely the property and rights of the employer (without being restricted to the provision of benefits under the plan) subject only to the claims of the employer’s general creditors.

The definition of “regular compensation” in G.L.c. 32, §1 reinforces the proposition that, while all wages are compensation, not all compensation is wages. Section 1 of chapter 32 defines “regular compensation" as “salary, wages or other compensation in whatever form . . ." (Emphasis added).

Despite the fact that G.L.c. 149, §148 has frequently been amended over the years, including amendments to include holiday and vacation payments as well as commissions within the definition of wages, the Legislature chose not to amend section 148 to include amounts of compensation deferred under a deferred compensation plan governed by 26 U.S.C. §457 within its scope after G.L.c. 29, §64B was enacted in 1988.

“Wages” is defined as “every form of remuneration of an employee . . . for employment by an employer, whether paid directly or indirectly ...” with eight enumerated exceptions. G.L.c. 151A, §l(s)(A).

’’Average weekly wage” is defined as “the earnings of the injured employee during the period of twelve calendar months immediately preceding the date of injury, divided by fifty-two . . .” G.L.c. 152, §1(1). Fringe benefits, such as health insurance plans, pensions, day care, or education and training programs provided by employers, are not included in “employee earnings” for the purposes of calculating average weekly wages. Id. These exceptions do not track the exclusions from the definition of wages found in G.L.c. 151A, §l(s)(A).

The issue before this court is not whether the defendants may subject amounts withheld pursuant to a deferred compensation arrangement to excessive or unnecessary delay before forwarding said amounts to the plan coordinator, but only whether the weekly wage law controls.