OPINION
Beta LaserMike, Inc. ("BLM") appeals from a judgment of the Montgomery County Court of Common Pleas which sustained in part and overruled in part its request for a preliminary injunction to restrain Jeffrey Swinchatt from working for Sikora Industrieelektronik GmbH ("Sikora"). Swinchatt cross appeals from the same judgment.
The pertinent facts were not in dispute. In 1991, Swinchatt became employed as a sales representative with Beta Instrument, Inc. ("Beta"), a company that sold measuring devices used in the wire and cable industry for manufacturing and quality control purposes. Shortly after beginning his employment, he signed a "Confidentiality Agreement" ("contract") with the company, which contained, inter alia, a noncompete agreement.
Between 1991 and 1996, Beta was acquired by Burnfield Group. By 1996, Swinchatt had become the regional sales manager for Beta. In 1996, Beta was acquired by Fairey Group, PLC. Fairey Group also owned LaserMike, Inc. ("LaserMike"). In 1997, Fairey Group decided to begin consolidating Beta and LaserMike. In April 1997, Swinchatt was offered a new position with the combined company, which eventually became known as BLM. In July 1997, Swinchatt relocated to Dayton, Ohio to begin his new position. Between July and December 1997, Swinchatt worked on projects for both Beta and LaserMike. In January 1998, the consolidation of the two companies officially took place, with Beta selling all of its assets, for their net book value, to LaserMike, leaving Beta with no gain or loss. The purchase agreement ("Asset Purchase Agreement") between Beta and LaserMike included a general provision stating that all of Beta's contracts and agreements were transferred to LaserMike. The Asset Purchase Agreement had a number of attachments, including one attachment listing specific items that were included in the sale. BLM continued conducting the businesses of its predecessors, which was developing, manufacturing, and selling instrumentation and control systems for the worldwide wire and cable industry.
By 1999, Swinchatt had been promoted to BLM's Director of Marketing for Wire and Cable, a position that gave him worldwide responsibility for the sales and marketing of the wire and cable measuring devices that BLM manufactured. At a trade show, Harry Prunk, an employee of Sikora, a competitor company of BLM, approached Swinchatt and told him that Sikora was "looking for good people." Swinchatt responded by saying, "[D]on't rule me out."
During the summer 1999, Swinchatt went to Europe on a BLM business trip. While on this trip, Swinchatt visited Sikora and met with Sikora personnel. Before leaving Europe, Swinchatt had Neil Donaldson, an employee in BLM's United Kingdom office, copy all of the files from Swinchatt's BLM-owned laptop computer onto two CD-ROMs.
On August 22, 1999, Swinchatt returned to the United States from his business trip. On August 25, 1999, Swinchatt purchased a new computer, which he took possession of on August 26, 1999. That evening, Swinchatt copied all of the information on his BLM-owned laptop computer to his new computer. On the morning of August 27, 1999, Swinchatt deleted all of the files on the BLM-owned laptop. He then went to BLM and resigned his position, informing BLM officials that he intended to accept a position with Sikora and telling them that he was "leaving [BLM] with nothing but what was in [his] head[.]" Following Swinchatt's resignation, BLM officials searched his personnel file and discovered the contract that he had signed while working at Beta. They also discovered that Swinchatt had copied the files from the BLM-owned laptop before his resignation and that he had asked Donaldson to download BLM files onto CD-ROMs.
On September 10, 1999, BLM filed a "Verified Complaint for Injunctive and Other Relief" requesting preliminary and permanent injunctions to restrain Swinchatt from disclosing any confidential information or trade secrets of BLM and from working for Sikora or any other BLM competitor for the term of one year, as specified in the noncompete agreement. The complaint also requested that Swinchatt be ordered to immediately return to BLM the CD-ROMs and the information which he had copied from the BLM-owned laptop. On the same day, the trial court granted BLM's motion for a temporary restraining order, barring Swinchatt from performing any services for Sikora or any other competitor of BLM for fourteen days. The temporary restraining order was extended for an additional fourteen days on September 27, 1999.
A hearing on the requested injunction took place on October 7, 8, and 15, 1999. On October 20, 1999, the trial court granted in part and overruled in part BLM's request for a preliminary injunction. The trial court restrained Swinchatt from utilizing or disclosing any confidential information or trade secrets of BLM and from working for Sikora or otherwise competing with BLM until January 1, 2000. The trial court also ordered Swinchatt to return any confidential BLM information and to refrain from soliciting any BLM employees.
BLM advances one assignment of error on appeal. Swinchatt advances one assignment of error on cross appeal. BLM's assignment of error is as follows.
 THE TRIAL COURT ERRED TO THE PREJUDICE OF BETA LASERMIKE IN ENTERING JUDGMENT AGAINST IT ON COUNT I OF THE COMPLAINT (OCT. 20 DECISION P. 2 AND NOV. 10 ORDER).
BLM raises five issues under this assignment of error. Before discussing the issues, the appropriate standard of review must be established.
BLM argues that the standard of review in this case is denovo because the appeal centers on the interpretation of two written instruments: the contract and the Asset Purchase Agreement.
"`If a contract is clear and unambiguous, then its interpretation is a matter of law[.]'"
Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm (1995), 73 Ohio St.3d 107,108, 652 N.E.2d 684, 686, quoting Inland RefuseTransfer Co. v. Browning-Ferris Industries of Ohio, Inc. (1984),15 Ohio St.3d 321, 322, 474 N.E.2d 271, 272. Matters of law are reviewed by an appellate court de novo. Nationwide Mut. Fire Ins.Co., 73 Ohio St.3d at 108, 652 N.E.2d at 686, citing Ohio BellTel. Co. v. Pub. Util. Comm. (1992), 64 Ohio St.3d 145, 147,593 N.E.2d 286, 287. Because the contract and the Asset Purchase Agreement are clear and unambiguous, we will review their languagede novo.
This case involves more, however, than the interpretation of two written documents; it involves our review of the trial court's decision on BLM's motion for an injunction. The standard of review regarding a trial court's decision on a motion for an injunction is whether the trial court abused its discretion.State ex rel. Miller v. Private Dancer (1992), 83 Ohio App.3d 27,32, 613 N.E.2d 1066, 1070. Abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable.Id. Thus, although we will review the language of the two documents de novo, we will review the trial court's decision regarding the motion for an injunction under an abuse of discretion standard.
BLM argues that the trial court erred when it determined that the contract was unassignable and invalid without first determining which state's law governed the contract. BLM argues that the trial court's decision should have been decided under Massachusetts law because the contract had a choice-of-law provision which stated, "This Agreement shall be governed by the laws of Massachusetts."
The trial court concluded as follows regarding the noncompete agreement:
 [T]he Court finds that said agreement * * * is invalid and not binding on [Swinchatt] since there was no mutual assent between the present parties to this lawsuit that the "agreement" was to be part of [Swinchatt's] employment with [BLM] commencing in 1997. Nor was there any language in the original agreement suggesting that such [agreement] would be applicable to any "successors or assigns" of [Beta.]
Because the trial court failed to cite any statutory or case law in support of its conclusions, it is unclear whether it applied Ohio or Massachusetts law.
In Schulke Radio Productions, Ltd. v. Midwestern BroadcastingCo. (1983), 6 Ohio St.3d 436, 453 N.E.2d 683, syllabus, the Supreme Court of Ohio held as follows:
 The law of the state chosen by the parties to govern their contractual rights and duties will be applied unless either the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or application of the law of the chosen state would be contrary to the fundamental policy of a state having a greater material interest in the issue than the chosen state and such state would be the state of the applicable law in the absence of a choice by the parties.
In Schulke, the court found that a substantial relationship existed between the chosen state, New York, and the parties to the contract when one of the parties was based in New York at the time the contract was entered, the contract was executed in New York, and it was performed, in part, in New York. Id. at 439,453 N.E.2d at 686.
The record reveals that Swinchatt signed the noncompete agreement with Beta while he was in Massachusetts and that his initial employment with Beta was based in Massachusetts. Although we believe that the facts of this case present a closer call than those in Schulke, we nevertheless conclude that there was a substantial relationship between Massachusetts and the parties. Further, application of Massachusetts law would not be contrary to the fundamental policy of Ohio law because the law in both states is similar regarding the issues in this case. Thus, we conclude that the trial court should have applied Massachusetts law in this case.
BLM argues that the trial court erred in concluding that the contract containing the noncompete agreement was not assignable because it lacked language suggesting that it was assignable to Beta's successors.
The contract stated, in part, as follows:
 2. Noncompetition: For a period of one year following the Employee's termination from Beta for any reason, the Employee shall not compete with Beta, directly or indirectly, in the business of design, manufacture, or sale of industrial process control machinery and equipment for use in the wire and cable, tube, optical fiber, and steel industries.
Under Massachusetts law, like Ohio law, the general rule is that a contractual right can be assigned unless assignment of thatright is expressly forbidden by the terms of the contract.American Emp. Ins. Co. v. City of Medford (1995),38 Mass. App. Ct. 18, 644 N.E.2d 241, 243, review denied (1995),419 Mass. 1111, 647 N.E.2d 721; Lake Shore DriveDev. Corp. v. Hilditch (June 13, 1986), Ottawa App. No. OT-86-4, unreported, at *4. Noncompete agreements are one of the many contractual rights that are assignable. Adamowicz v. Iwanicki (1934), 286 Mass. 453,456, 190 N.E. 711, 712; Rogers v. Runfola Assoc., Inc. (1991),57 Ohio St.3d 5, 7, 565 N.E.2d 540, 543. The contract containing the noncompete agreement between Beta and Swinchatt did not expressly state that it was non-assignable. Thus, the trial court erred in concluding that the contract was invalid because it lacked language suggesting that it was assignable.
BLM argues that the contract containing the noncompete agreement was, in fact, assigned from Beta to BLM.
LaserMike and Beta officially consolidated in January 1998 and became known as BLM. As part of that consolidation, there was an Asset Purchase Agreement between the two companies. The Asset Purchase Agreement stated, in part, as follows:
 1.01. Purchase and Sale of Purchased Assets. Upon the terms and subject to the conditions of this Agreement, on the Closing Date, [Beta] shall sell, transfer, assign, convey and deliver to [LaserMike], and [LaserMike] shall purchase from [Beta], free and clear of all Encumbrances, all of [Beta]'s right, title and interest in and to all assets (whether tangible or intangible), contracts, leases and agreements used in the conduct of [Beta]'s business, including (but not limited to) the assets, contracts, leases and agreements listed on Annex I hereto * * *.
Annex I was a balance sheet which listed various assets that Beta owned and indicated the dollar value of each asset. Swinchatt argues that because Beta's employment contracts, including the contract that he had signed, were not listed on Annex I, they were not included in the transfer and thus were not assigned to LaserMike. The Asset Purchase Agreement clearly states, however, that all of the contracts Beta used in its business were being transferred to LaserMike. Annex I only listed some of the things that were to be included in the transfer. Further, Annex I listed things such as bank accounts, equipment, and property. Those things had values that could be determined easily and are not similar in nature to a contract containing a noncompete agreement. Finally, the contractual provision expressly states that Annex I does not list all of the transferred assets. Thus, we conclude that, pursuant to the Asset Purchase Agreement, the contract containing the noncompete agreement was assigned to BLM.
Swinchatt argues that BLM failed to prove that the contract was assigned to Burnfield when it acquired Beta between 1991 and 1996 or to Fairey Group when it acquired Beta in 1996. From our review of the record, which contains no evidence regarding whether or not the contract was assigned to Burnfield or Fairey Group, it appears that Swinchatt failed to raise this argument at trial and thus waived it. Moreover, as we stated above, the contract containing the noncompete agreement was assignable because its terms did not expressly forbid assignability. Thus, Swinchatt's argument is not persuasive.
BLM argues that the trial court erred in finding that Swinchatt's acceptance of his new position at BLM in 1997 terminated the contract containing the noncompete agreement. The trial court concluded that the noncompete agreement was invalid because there was no mutual assent between Swinchatt and BLM that the contract was to be part of Swinchatt's employment with BLM.
Swinchatt argues that because BLM officials were unaware of the contract that Swinchatt had signed with Beta when they offered him the new position, they could not have intended it to be part of their employment contract with him. As we stated supra, however, the contract was assigned to BLM through the Asset Purchase Agreement, so regardless of whether BLM officials were aware of its existence, the contract remained in effect through the merger. Further, during the discussion of Swinchatt's new position with the combined companies, neither Swinchatt nor BLM specifically stated an intention to terminate the contract. Under the facts of this case, where Swinchatt relocated in Dayton in July 1997 but continued working on projects for Beta until the consolidation of the two companies was official, neither the merger of Beta and LaserMike nor Swinchatt's acceptance of his new position with the combined companies strikes us as an event that would impliedly revoke the contract. Thus, the trial court erred in concluding that the contract was invalid because the parties had failed to express mutual assent that it continue through the merger of the two companies.
BLM next argues that the noncompete agreement in the contract is enforceable under Massachusetts law because its restrictions are reasonably necessary for the protection of BLM and it does not impose an undue hardship on Swinchatt.
Under Massachusetts law, a noncompete agreement will be enforced if it: 1) protects an employer's legitimate business interests; 2) is supported by adequate consideration; 3) is reasonable in time, geographic area, and subject matter in light of the circumstances of the case; and 4) is consonant with the public interest. Marine Contractors Co., Inc. v. Hurley (1974),365 Mass. 280, 310 N.E.2d 915, 918-921; Novelty Bias Binding Co.v. Shevrin (1961), 342 Mass. 714, 175 N.E.2d 374, 375, Abramson v.Blackman (1960), 340 Mass. 714, 716, 166 N.E.2d 729, 730.
The noncompete agreement must first protect an employer's legitimate business interests. Although freedom from ordinary business competition is not a legitimate business interest of an employer, confidential business information, trade secrets, and good will do qualify as legitimate business interests which can be protected by a noncompete agreement. Marine Contractors Co., Inc.,365 Mass. 280, 310 N.E.2d at 920. Confidential business information includes anything not widely known by non-employees of the company, such as knowledge of a company's expansion plans, merchandising strategy, successful locations and products, marketing devices, recent past profitability, and present investment strength. Kroeger v. Stop Shop Co., Inc. (1982),13 Mass. App. Ct. 310, 432 N.E.2d 566, 570, review denied (1982),386 Mass. 1102, 440 N.E.2d 1175.
During the trial, Michael Watts, president of BLM, testified that Swinchatt was the most highly paid salaried employee that reported to him. He stated that Swinchatt had had access to BLM's marketing strategy, business strategy, pricing strategy, price list, cost information, gross margins, profitability, customer list, product development plans, current projects, and future products. Watts stated that none of this information was readily available or ascertainable by BLM's competitors. Watts stated that the only information that Swinchatt had not had access to was the manufacturing process of BLM products and the compensation information of BLM employees. Further, Swinchatt himself admitted that he had had access to BLM's confidential information and that the files he had copied had contained confidential information. Among the BLM files that he had copied were records listing BLM customers, the key contact people for those customers, their phone numbers, notes regarding BLM salesmen's visits with customers, and details about the customers' needs for and usages of BLM products. Because Swinchatt had access to BLM's confidential business information, BLM did have a legitimate business interest to be protected by the noncompete agreement.
To be valid, the noncompete agreement must be supported by adequate consideration. If the noncompete agreement is executed near the beginning of an employee's employment, Massachusetts courts conclude that adequate consideration has been provided in the form of the employment itself. Reece, Employee Non-Competition Agreements and Related Restrictive Covenants: A Review and Analysis of Massachusetts Law (1991), 76 Mass.L.Rev. 2, 7. Further, Massachusetts courts appear to find that the continued employment of an at-will employee provides adequate consideration for a noncompete agreement. Reece, at 7; NewEngland Tree Expert Co., Inc. v. Russell (1940), 306 Mass. 504,28 N.E.2d 997, 998, 1000 (enforcing noncompete agreement that was entered into by employee two months after he began employment with employer without requiring consideration beyond continued employment).
Swinchatt signed the noncompete agreement with Beta "late in the week, like Friday, [of] the first week" of his employment with BLM. We believe that, under Massachusetts law, one week was sufficiently close to the beginning of his employment for the employment itself to qualify as consideration for the contract. Further, there is nothing in the record to indicate that Swinchatt was not an at-will employee of Beta, so his continued employment with the company would also qualify as adequate consideration.
The noncompete agreement must be reasonable in time, geographic scope, and subject matter in light of the circumstances of the case. In determining whether the time limitation set in the noncompete agreement is reasonable, Massachusetts courts "consider the nature of the [employer]'s business and the character of the employment involved, as well as the situation of the parties, the necessity of the restriction for the protection of the employer's business and the right of the employee to work and earn a livelihood." Richmond Bros., Inc. v. WestinghouseBroadcasting Co., Inc. (1970), 357 Mass. 106, 256 N.E.2d 304, 307. Many of the Massachusetts cases that we reviewed found that noncompete agreements with time restrictions in excess of one year were reasonable. See, e.g., Marine Contractors Co., Inc.,365 Mass. 280, 310 N.E.2d at 921 (finding that although original five year restriction in noncompete agreement was "troublesome," injunction was not issued until two years had passed, and barring employee from competing with his former employer for the remaining three years of the original five year period was neither excessive nor unreasonable under the circumstances of the case); NoveltyBias Binding Co., 342 Mass. 714, 175 N.E.2d at 377 (stating that three year restriction in noncompete agreement was reasonable because former employer would be particularly vulnerable to a competitor who had the employee in his service during that time period). At least one Massachusetts case reminds us, however, that an employee's knowledge of confidential information will eventually go stale, as consumer trends and marketing strategies are valuable only for a limited duration. Kroeger,13 Mass. App. Ct. 310, 432 N.E.2d at 571.
In granting the injunction under Ohio's trade secret law, the trial court stated:
 This Court's view of the evidence * * * is that this marketplace is subject to change perhaps as often as when the next trade show occurs. Newly developing technology and applications appear of high priority, and the value of [Swinchatt]'s knowledge of [BLM]'s products, market strategy, et cetera to Sikora appears temporal at best. [Ohio case law] admonishes that a court imposed restriction on employment or trade in general should be no greater than is required for the protection of the employer.
 The Court finds that any commercial advantage, as described in Ohio Revised Code 1333.62, to Sikora from [Swinchatt]'s intimate knowledge of [BLM]'s customers, product cost and profit, market strategy, et cetera will likely expire by the end of calendar year 1999.
Although we agree that the technology in which BLM is involved is quickly changing and that the confidential business information to which Swinchatt was privy will eventually go stale, we do not believe that a one year restriction is unreasonable under the circumstances of this case. Swinchatt was one of the highest salaried employees at BLM and through his position, he gained intimate knowledge of nearly all of BLM's confidential business information. Although the technology of BLM's business may change quickly, BLM's business strategy, marketing strategy, and pricing strategy are not likely to change greatly within a few months' time. Further, product development likely takes more than just a few months, so knowledge of BLM's plans for current and future projects will continue to be valuable for a period of time beyond a few months. Although many of the Massachusetts cases which we reviewed were not decided recently and might not have involved the type of technology that is involved in this case, they lead us to believe that Massachusetts courts would conclude that a one year restriction under the facts of this case was not unreasonable.
In examining the reasonableness of the restriction in geographic scope, we note that Massachusetts courts generally enforce a noncompete agreement that encompasses the employee's former work area. Marine Contractors Co., Inc., 365 Mass. 280,310 N.E.2d at 921 (finding noncompete agreement's restriction in geographic area reasonable where it coincided with the area where the employee's former employer performed its work); All Stainless,Inc. v. Colby (1974), 364 Mass. 773, 308 N.E.2d 481, 487 (stating enforcement of noncompete agreement would be reasonable if it prohibited the employee from selling products of his employer's competitor only within his former sales territory); see, also,Kroeger, 13 Mass. App. Ct. 310, 432 N.E.2d at 570 (stating that "[r]estraints upon the competitive activity of a key executive may range beyond the precise geographical area of the activity at the time of the employee's departure").
Swinchatt testified that in his position as BLM's Director of Marketing for Wire and Cable, his region of responsibility was worldwide. Watts testified that BLM served customers worldwide and that Swinchatt had called upon customers worldwide. He stated that BLM's chief competitors, Zumbach and Sikora, were based in Switzerland and Germany respectively. Thus, the lack of geographical restriction in the noncompete agreement was reasonable.
Massachusetts courts also require that the noncompete agreement be reasonable in subject matter. In other words, an "employer may prevent his employee * * * from using, for his own advantage or that of a rival and to the harm of his employer, confidential information gained by him during his employment; but he may not prevent the employee from using the skill and general knowledge acquired or improved through his employment." Abramson,340 Mass. 714, 166 N.E.2d at 730 (finding that noncompete agreement's prohibition of the use of "any information" that employee had gained while working for employer was too broad).
The noncompete agreement stated that Swinchatt was prohibited from competing with Beta, "directly or indirectly, in the business of design, manufacture, or sale of industrial process control machinery and equipment for use in the wire and cable, tube, optical fiber, and steel industries." This restriction does not prevent Swinchatt from using the skill and general knowledge that he developed as a director in a worldwide company. Further, the restriction does not prevent Swinchatt from working in an industry other than the wire and cable, tube, optical fiber, and steel industries. Thus, the restriction in the noncompete agreement was reasonable in subject matter.
The noncompete agreement must be consonant with the public interest. To determine this, Massachusetts courts look at whether enforcement of the noncompete agreement would create a monopoly against the public interest and whether it would impose an undue hardship on the employee by barring him from earning a living in his trade. Marine Contractors Co., Inc., 365 Mass. 280,310 N.E.2d at 921. Public interest is not jeopardized as long as there are competitors in the same business. Id. Further, "[t]he consequence of every [noncompete agreement] * * * is that the [employee] is deprived of a possible means of earning his living, within a defined area and for a limited time[, so that] fact alone does not make [a noncompete agreement] unenforceable." Id.
Swinchatt testified that there are four companies which manufacture instrumentation and control machinery to fully serve the wire and cable industry: BLM, Sikora, Zumbach, and TSI. Thus, enforcement of the noncompete agreement to prevent Swinchatt from competing in that industry for one year would not create a monopoly in the market for BLM. Further, there is no evidence in the record that Swinchatt will suffer an extraordinary hardship if the noncompete agreement is enforced. Thus, we cannot say that the noncompete agreement is not consonant with the public good.
As all the elements required for a noncompete agreement are satisfied, we must conclude that the noncompete agreement in this case is valid and enforceable under Massachusetts law. The trial court acted unreasonably in denying BLM's motion to enforce the contract as it was written.
BLM's assignment of error is sustained.
Swinchatt's assignment of error on cross appeal is as follows.
 THE COURT ERRED IN GRANTING AN INJUNCTION AGAINST SWINCHATT FOR THE PERIOD WHICH WOULD EXPIRE JANUARY 1, 2000.
The trial court refused to grant BLM's motion for an injunction pursuant to the terms of the noncompete agreement. The trial court did, however, apply Ohio's trade secret law, R.C.1333.62, to issue an injunction to prevent Swinchatt from working for Sikora or any direct competitor of BLM in the gauging and process control industry marketplace until January 1, 2000.
Swinchatt argues that the trial court erred in issuing an injunction under Ohio law because BLM failed to demonstrate that the information that he had taken qualified as a "trade secret" as defined by R.C. 1333.61(D).
On January 13, 2000, BLM filed a motion to dismiss Swinchatt's cross appeal, arguing that since the injunction had already expired on January 1, 2000, Swinchatt's cross appeal was moot. In the alternative, BLM argued that the injunction was not a final appealable order and that Swinchatt's cross appeal should be dismissed for lack of jurisdiction.
The injunction under Ohio's trade secret law was granted only through December 31, 1999. Because the injunction has already expired, Swinchatt's arguments regarding whether an injunction under Ohio law was appropriate are moot. In re Lewis Children
(Aug. 5, 1996), Stark App. No. 1995 CA 00339, unreported, at *1. Thus, we will not address Swinchatt's arguments or determine whether we would have had jurisdiction to hear them. Swinchatt's cross assignment of error is overruled.
The judgment of the trial court will be reversed and remanded for enforcement of the one year restriction pursuant to the terms of the noncompete agreement. Although BLM argues that Swinchatt should be restrained for eight months and ten days since the temporary injunction was issued from September 10, 1999 to December 31, 1999, we believe that under the circumstances of the case and pursuant to the terms of the contract, he should be restrained only for the balance of the one year term. Thus, the injunction should expire on August 27, 2000, one year from the day Swinchatt resigned his position.
BROGAN, J. and YOUNG, J., concur.